No. 46,512

The State of Kansas, *Appellee,* v. Richard D. Blake, *Appellant.*

(495 P. 2d 905)

Opinion filed April 8, 1972.

*Thomas F. Richardson,* of Light, Yoxall and Antrim, of Liberal, argued the cause and was on the brief for the appellant.

*Gary R. Hathaway,* county attorney, argued the cause, and *Vern Miller,* attorney general, and *Richard M. Pickler,* former county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: This is a first degree murder case in which the defendant pleaded insanity and the jury convicted him of murder in the second degree for the fatal shooting of his two and one-half year old daughter, Kandee.

On appeal defendant presents several issues, the two major ones being (1) whether his amnesia covering the period surrounding the homicide rendered him incompetent to stand trial, and (2) whether the trial court's questioning of defendant's psychiatric expert coupled with its instructions deprived him of a fair trial on his insanity defense.

While the record is somewhat skimpy as to the shooting itself, there is no significant factual dispute. Defendant was, by all accounts a loving and devoted father, a factor which may have contributed to his divorce from Kandee's mother, Donna Blake. On March 27, 1970, at about 1:00 a. m., defendant called friends in Ulysses, Mr. and Mrs. J. T. Duncan, to announce that he was coming to see them later that day. He arrived at their trailer house around noon and with their help arranged for his former wife, Donna, to bring Kandee over for a visit.

He intended to take Kandee downtown to buy a dress, so after the visit had been arranged he went outside and started his pickup truck. He returned to the trailer house for coffee, and then again went out to his truck. He was there when Donna arrived with Kandee in a car driven by Donna's sister, Barbara Lattimore.

Donna and Kandee were promptly forced into the truck by the defendant. Just when the lethal weapon, a .22 calibre pistol, first appeared is not clear, but it was apparently fired shortly after they climbed into the truck. Barbara Lattimore, still in her car, heard shots and promptly ran it against the side of the truck.

Defendant testified that he was standing by the truck, *sans* pistol, and was nicked in the leg in this ramming maneuver; Barbara said he used the pistol to force Donna into the truck. In any event, at least two more shots were fired, one into Kandee's head and one a "contact" shot into her body. Apparently Donna was also wounded.

After the fatal shots defendant went to the Duncan trailer, where the Duncans had retreated and locked the door after them, broke the glass in the door and went in.

Upon entering the trailer defendant talked to Mr. Duncan and told him, according to Mrs. Duncan, "I've shot Candy." He also discussed whether a doctor or an ambulance should be called first. He then sat down at a table, where officers found him some time later, gun in hand.

On May 20, 1970, after his preliminary hearing, defendant was referred to the security state hospital at Larned pursuant to

K. S. A. 62-1531 to determine whether he was competent to stand trial. On June 24, 1970, that institution reported to the court by letter:

"It is our considered opinion that Mr. Blake is capable of understanding the nature and object of the proceedings now pending against him, charging him with murder in the first degree of one Kandee Blake.

"Whether he rightly comprehends his own condition with reference to such proceedings is questionable because of his complete lack of conscious recall of the specific crime in question. Further it is our opinion that he is not able to conduct his defense in a competent, rational manner because of his lack of motivation and a lack of self concern at this time."

On October 16, 1970, the hospital made a further report in which the doctors concluded that "the patient is competent to stand trial and assist in his own defense." Enclosed was a report of their latest interview with defendant, reciting that, "we have come to the decision that he is competent to stand trial as he is aware of his charges and is in a position to assist his own attorney in his defense, although he is still having the hysterical amnesia over part of the incident of the shooting one Kandy Blake."

The record discloses no specific finding by the trial court on the issue of competency, although one is implicit in the setting of the matter for trial and the overruling of defendant's motions for continuance, made before trial and after the testimony of Mrs. Duncan. Both motions were based on the unrefuted evidence that defendant suffered from hysterical amnesia resulting in an inability to remember any of the events between the time Barbara's car hit the truck and when the officers took him into custody at the Duncans' table. The state makes no contention that defendant's amnesia is a sham. On the other side of the coin, there was nothing to indicate that the defendant was not fully aware of his position and the charges against him, or that he was not perfectly competent to consult with counsel—except regarding those events he was unable to remember.

We are thus squarely faced with the question of whether amnesia, standing alone, renders a defendant incompetent to stand trial. Examination of this question must start with the applicable statute, former K. S. A. 62-1531, making the test of incompetency to stand trial whether the defendant was "insane, an idiot or an imbecile and unable to comprehend his position, and to make his defense." These stark and archaic words have been judicially construed to mean that:

"The test of insanity of an accused precluding his being put on trial for a criminal offense is his capacity to comprehend his position, understand the nature and object of the proceedings against him *and to conduct his defense in a rational manner.*" (*State v. Severns,* 184 Kan. 213, 336 P. 2d 447, Syl. ¶ 2. Emphasis added.)

The foregoing is a restatement of the rule as it had evolved in many prior cases, and has been followed since. *E. g., State v. Swinney,* 200 Kan. 404, 436 P. 2d 876. It is in accord with the standard approved in *Dusky v. United States,* 362 U. S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788, that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him."

Our only case dealing with amnesia, however, is *State v. Severns,* supra. We there noted the paucity of decided cases, and found not controlling those few which were cited "in which memory loss, standing alone, has been relied on as precluding trial of the accused in a criminal action." (*Id.* 184 Kan., at 220.)

In *Severns* the defendant had been tried once at a time when his memory was presumably unimpaired, and had testified in his own behalf. His memory loss occurred while awaiting a retrial after his first conviction was reversed on appeal. There was available a complete transcript of the first trial, including his own testimony. Amnesia was recognized as a mental condition which *might* render him so "insane" as to make him statutorily incompetent to stand trial. However, while not putting it in just those terms, we looked to the fundamental fairness of the situation and in effect rejected the proposition that amnesia *per se* amounts to incompetency, saying:

". . . the all-important question . . . must be determined in the light of the facts before the trial court at the time it reached its conclusion his loss of memory between the first and the second trial was not sufficient in and of itself to prevent him from again proceeding to trial for the crime of murder." (*Id.,* at 221.)

We then proceeded to examine the facts and circumstances before the trial court, and concluded, "that tribunal did not abuse sound judicial discretion in holding that his loss of memory between the first and second trials was not sufficient, in and of itself, to prevent him from proceeding to trial." (*Id.,* at 223.)

One recent case exemplifies some alternative approaches. In *Wilson v. United States,* 391 F. 2d 460 (D. C. Cir. 1968) the de-

fendant in a robbery case ran his car into a tree during a high speed chase. The result was an organic memory loss, almost certainly permanent, as to the events surrounding the alleged robberies. (In our case the amnesia is "hysterical," or emotional, in origin, and may be dispelled by time and treatment.) The trial court nevertheless put him on trial on the assumption that defense counsel could secure from other sources substantially the same information that the defendant's independent recollection would provide if functioning normally. (*United States v. Wilson*, 263 F. Supp. 528 [D. D. C. 1966].)

On appeal the three judges on the hearing panel took three separate paths. Judge Wright announced the judgment of the court, remanding the case for a post-trial hearing and detailed findings as to whether the trial court's prediction that the presence of amnesia would result in "no prejudice" had been borne out by the events at the trial. He agreed with the trial court that the essential question was whether, "in the light of the personal intellectual or emotional deficiencies of the accused he can perform the functions essential to the fairness and accuracy of the particular proceedings in which he is presently involved." (391 F. 2d, at 463.) His issue was fairness and the remand was for the purpose of resolving it.

Judge Leventhal concurred in this disposition but thought the record indicated that a fair trial had clearly been had despite the amnesia. In his view, the loss of memory would be prejudicial only if there was a reasonable possibility that possession of memory would have enabled the defendant to present some legal defense otherwise precluded. He could conceive of no such defense, and would therefore have affirmed.

Only Judge Fahy felt that memory was an essential element, *per se*, of competency to stand trial, and hence dissented. He found the effect of the amnesia to be "very much as though he were tried in absentia notwithstanding his physical presence at the time of trial." (391 F. 2d, at 466.)

We are persuaded that a case by case evaluation of the fair-trial effect of amnesia, adopted explicitly by the majority in *Wilson* and implicitly by this court in *Severns*, is the sounder rule; we again reject the *per se* approach. In this we do not appear out of step with contemporary judicial thinking, for "there is no record of any court holding a defendant incompetent to stand trial solely

on the basis of amnesia." (Note, "Amnesia: A Case Study in the Limits of Particular Justice," 71 Yale L. J. 109, 116 [1961].)

We are not convinced by Judge Fahy's "in absentia" analogy, at least as applied to the present case. We do not have here a Kafkaesque defendant, on trial for he knows not what. In our case, defendant's memory is unimpaired until a time moments before the shooting, and picks up again shortly thereafter; the obliterated period is a very short one. He appears in all other respects to be in complete control of his faculties.

As to possible defenses foregone, there is no suggestion that anyone other than defendant fired the fatal shots, and the defenses of accident and self defense are precluded by the number of shots fired and the age of the victim. The only possible advantage this defendant was deprived of by his memory loss was the opportunity to advise counsel, and to testify, as to his state of mind at the time of the shooting. Whatever detriment this factor might have worked was more than overcome by the testimony of three psychiatrists, each of whom expressed a well founded expert opinion on that state of mind. We believe that, under the circumstances of this case, defendant's amnesia did not prevent him from making a "rational" defense.

Since we are reversing the judgment on other grounds and remanding the cause for a new trial, we wish to make it clear that we are holding on this issue only that the appellant has failed to show error in denying his motions for a continuance, since the trial court's implied finding that he was competent to stand trial is supported by the record. We do not intend to foreclose inquiry into the defendant's competency at the time of retrial if the issue should again be raised.

Because we are remanding a word needs to be said about defendant's ingenious argument that his alleged statement to the Duncans that "I've shot Candy" is inadmissible hearsay. He argues that this was an "admission" under K. S. A. 60-460 (g) because, in his then psychotic state, he was incapable of making a knowing and voluntary admission. For much the same reason he urges that it was not a "contemporaneous statement" under 60-460 (d) (2). The reason for the first exception, he says, is the availability of the declarant for cross examination—an element not present here because of the amnesia. The other, he says is not available because the requisite spontaneity is counterbalanced by the untrustworthi-

ness of the statement of a psychotic. As to both arguments we would suggest that whether he was then psychotic and, if so, what effect that condition had on him, was perhaps the primary issue being tried. Any effect his mental state may have had on his declarations was for the jury to determine. As to the second, in particular, a "nervous excitement" is the statutory requisite for admissibility. Even prior to its codification the presence of that element has been relied on to admit statements as *res gestae*—even when made by a person in a state of shock. *Drake v. Moore,* 184 Kan. 309, 336 P. 2d 807. But beyond all this, where a person's state of mind is in issue, the mere fact that such person spoke, and what he said, may be relevant to his mental condition at that time. A statement offered for this purpose is not hearsay at all, since it is not offered "to prove the truth of the matter stated" but to prove that a statement was made. The statement here was admissible on this ground without fitting into one of the statutory exceptions to the hearsay rule.

Defendant also contends that the state failed in its proof because there was no direct evidence of purpose or malice on his part, and the question again becomes important because of the remand. The evidence of malice being purely circumstantial, the question really is whether there was evidence from which the jury might draw a reasonable inference of guilt (*i. e.,* of malice). *State v. Patterson,* 200 Kan. 176, 434 P. 2d 808; *State v. Scoggins,* 199 Kan. 108, 427 P. 2d 603. We have long held that malice may be inferred solely from the fact that killing was effected by a deadly weapon. *State v. Earnest,* 56 Kan. 31, 42 Pac. 359; *State v. Dull,* 67 Kan. 793, 74 Pac. 235; *State v. Killion,* 95 Kan. 371, 148 Pac. 643. The effect of defendant's mental condition was for the jury. *State v. Sagebiel,* 206 Kan. 482, 480 P. 2d 44; *State v. Coltharp,* 199 Kan. 598, 433 P. 2d 418; *State v. Mendzlewski,* 180 Kan. 11, 299 P. 2d 598. Should the state's evidence on a new trial be substantially the same as on this trial it would be sufficient to go to the jury.

Defendant's last two points will be discussed together because it is their interaction that we perceive as denying defendant a fair trial. They involve the court's questioning of a defense psychiatrist and its instruction on former K. S. A. 62-1532.

As noted earlier, the defense was insanity. In support of his theory defendant introduced various witnesses who testified to his affectionate relationship with his daughter. His own testimony

dealt largely with his relationship with his former wife, with Kandee, and with his parents and in-laws; his testimony as to the day of the shooting took him to the time when Donna and Kandee were in the truck, he was standing beside it, and it was rammed.

His chief witnesses were three psychiatrists who were unanimous in their opinion that his amnesia was real, not feigned, and that he was insane at the time of the shooting. Two of the doctors were staff physicians at Larned state hospital who had observed defendant over a period of months during his incarceration there.

The third, with whom defendant chose to close his case, was Dr. Donald Neher, associate director of the Menninger School of Psychiatry in Topeka. His testimony was based on lengthy personal interviews with defendant and on defendant's ten day stay at the Menninger Foundation where he had undergone an intensive psychiatric evaluation, in conjunction with physical, psychological and neurological tests, X-rays, an electroencephalogram, and a sodium amytal interview. It was his opinion that defendant "couldn't possibly" have known what he was doing or have been able to distinguish right from wrong at the time of the shooting.

After both the state and defendant had completed their examination, and as the trial was about to end, came the crucial exchange:

"THE COURT: Doctor, would you care to discuss the probabilities or the possibilities of a reoccurrence of violence by the defendant under similar or like circumstances—factual circumstances?

"A. In similar circumstances it's quite possible unless he receives some treatment.

"THE COURT: No further questions.

"MR. PICKLER [the prosecutor]: No further.

"THE COURT: You don't care to elaborate on that further?

"A. He's not changed.

"THE COURT: I am not an expert. I'm not telling you to—

"A. No. I can very easily. He's not changed. If the situation was as I think it was, there was the explosion, the head of steam was discharged. He's then restored to his usual sort of psychological state. Put him in the circumstances where he feels as frustrated and helpless as he did at this time, it's quite likely it would happen again. Just what the result would be, I have no way of knowing.

"THE COURT: Thank you very much.

"REDIRECT EXAMINATION (CONT.)

"BY MR. TOMSON [defense counsel]:

"Q. With regard to where there's an absence of any child on his part, it's rather inconceivable that he could be in a similar—situation very similar to what he was in that day in question, is that right?

"A. It couldn't be exactly. I think it's unlikely that he would get in such a situation.

"Q. Okay.

"THE COURT: Wait a minute, Doctor. Since you brought that up, do you mean to say it's inconceivable that he could ever get himself into another situation since no child involved that would—could stimulate to recurrence of violence?

"A. Judge, I mean this totally, sincerely and completely. I can conceive of situations in which the same thing would happen to me. It would take much, much more pressure, I hope.

"THE COURT: All right. You may step aside.

"Defendant rested."

We have recognized the right of a trial judge to cross-examine witnesses where necessary to prevent a miscarriage of justice, but have always coupled such recognition with words of warning. Thus we have said:

"Our reports are replete with decisions on the question of just how far a trial judge may go in the examination of a witness, particularly a defendant or prosecuting witness in a criminal case. Perhaps no hard and fast rule can be laid down due to the many and varied circumstances in which the question arises. The purpose of a trial in a criminal case is to ascertain the truth of the matters charged against the defendant and it is a part of the business of the trial judge to see that this end is attained, even though in accomplishing the full development of the truth it sometimes becomes necessary for him to examine and cross-examine the witnesses. (*State v. Miller*, 127 Kan. 487, 274 Pac. 245.)

"On the other hand, where, in the trial of a criminal case, the judge deems it necessary to cross-examine witnesses, and particularly the defendant, in order to prevent a miscarriage of justice, he must exercise great care to prevent giving the jury the impression that he is biased against the defendant and he must not forget the function of a judge and assume that of an advocate. The same applies with respect to the credibility of a witness and a judge should exercise great care and caution to say nothing within the hearing of the jury which would give them an indication of what he thought about the truth or falsity of any part of the testimony. The credibility of a witness is a matter to be determined by the jury. (*State v. Ridge*, 141 Kan. 60, 40 P. 2d 424.)" (*State v. Winchester*, 166 Kan. 512, 517-18, 203 P. 2d 229.)

In the same vein we said in *State v. Bean*, 179 Kan. 373, Syl. ¶ 2, 295 P. 2d 600:

"In those instances in criminal prosecutions where the trial judge deems it necessary to cross-examine a witness, and particularly the defendant, or to resort to other means in order to accomplish the full development of the truth of the matter in issue, he is bound to exercise extreme care to prevent giving to the jury the impression that he is biased against the defendant or that he does not consider the witness or the defendant worthy of belief, and he should not, by the form, manner or extent of his questioning and remarks, indicate to the jury his opinion as to the defendant's guilt."

These admonitions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact.

With these considerations in mind, an analysis of the court's questioning quoted above leaves us little doubt as to its probable effect on the jury. The first question elicited from the witness his opinion that, without treatment, defendant might again resort to violence. This, of course, had no relevance to any issue the jury was called upon to resolve; it had no bearing on his physical actions or his mental state at the time of those actions. Had the prosecutor asked the same question it would doubtless have been subject to objection, and properly so, on grounds of relevancy and materiality. However, when the prosecutor appeared content to let the matter drop, the court stepped in again and prodded the witness to "elaborate" on his prognosis. Finally, after defense counsel had made a valiant attempt to repair the damage by showing that the violence-provoking situation was "unlikely" to recur, the court entered the fray once against with its "Wait a minute" question, leading the witness to say that it was not "inconceivable" that defendant might be stimulated to further violence. Upon this note the trial ended.

We think the prejudicial effect of this exchange is obvious. The jury could not help but conclude that in the judge's opinion the defendant was dangerous, and should not be permitted to go at large.

With this idea firmly implanted in their minds, the next thing they heard was the judge's instructions, which included the verbatim text of former K. S. A. 62-1532. The first paragraph of that section provided that if the jury should find a defendant not guilty by reason of insanity they should so state in their verdict, and the defendant should then be committed to the security ward of the Larned state hospital. The second paragraph provided:

"Whenever it appears to the medical superintendent that such a patient is not dangerous to other inmates he may transfer the patient to any other ward of the Larned state hospital. Any patient committed under the terms of this section may be granted convalescent leave or discharged as any other committed patient after thirty days notice shall have been given to the county attorney and sheriff of the county from which such person was committed."

This instruction, taken with the fruits of the court's interrogation, could well lead the jury to conclude that a not-guilty-by-reason-of-insanity verdict could mean putting a dangerous killer on the street within thirty days.

Ordinarily the disposition of the defendant after the verdict is returned is no concern of the jury. Thus we have frequently held that instructing the jury on the possible penalties is improper except in capital cases where the jury must determine the punishment. *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739; *State v. Lytle,* 177 Kan. 408, 412, 280 P. 2d 924; *State v. Hathaway,* 143 Kan. 605, 608, 56 P. 2d 89.

In *State v. Andrews,* supra, and in *Andrews v. Hand,* 190 Kan. 109, 372 P. 2d 559, cert. den. 371 U. S. 880, 9 L. Ed. 2d 117, 83 S. Ct. 152, we held that the *defendant* was properly precluded from advising prospective jurors of the results of an "insanity" verdict, saying in the latter case (p. 115):

". . . It was the duty of the jury to determine the guilt or innocence of petitioner, and if it found him not guilty by reason of insanity to so declare. It was the duty of the district court to impose the proper sentence after the verdict has been reached. As held in *State v. Andrews,* supra, *it was no concern of the jury what penalty attached to its verdict in the event it found the petitioner not guilty by reason of insanity.*" (Emphasis added.)

The text writers say:

"In any case, the court should not inform a jury which is deliberating upon the question of sanity whether it will have anything further to do with the case if sanity is found to have existed, or inform them as to the disposition which will be made of the accused if he is found to be insane." (40 Am. Jur. 2d, Homicide, § 515, p. 768.)

The principle was put in pungent fashion by a Washington trial judge, whose action was approved in *State v. Barnes,* 54 Wash. 493, 103 Pac. 792. The jury there reported to the trial court that it had agreed that the defendant had committed the homicide charged, but were in disagreement on the sanity issue. They requested an instruction on what would happen to the defendant if he were found by them to have been insane at the time of the commission of the crime. Their concern was whether he might be restored to liberty after a short period, and indicated that without knowing the answer they would be at a hopeless deadlock on the sanity issue. After reflection the trial court discharged the jury, saying to them (54 Wash., at 495-6):

". . . The fact that you are making your verdict in this case dependent upon the punishment, or what might be done with this defendant after this trial, satisfies me that you should not consider this case at all. It is not a matter for your consideration whether he would be discharged or not discharged. The law is, however, that he, upon certain contingencies, may be discharged at any time that he is restored to sanity, if you should find him to be insane; upon doing certain things, or upon certain things happening, that he could be restored to his liberty. *But that ought not to enter into your consideration at all. It has nothing to do with the question of whether he was sane or insane at the time he committed the act. It goes to his punishment; and, in other words, to be plain and curt with you, it is none of your business; it is the business of the law;* and I, therefore, seeing that you cannot agree without taking that matter into consideration (which is entirely improper to take into consideration) feel that I would be doing the prisoner and the public both a great injustice to allow you to determine his guilt or innocence upon a question of that kind; and I therefore discharge you from further consideration of the case." (Emphasis added.)

Other courts in an analagous situation have held it improper to advise a jury determining the penalty in a capital case that, if they should fix the penalty at imprisonment, the defendant might be returned to society through pardon or parole. See cases collected, Anno., 12 A. L. R. 3rd 832.

All of these are based on the well entrenched principle that a jury should not be distracted by instructions or consideration of matters that are none of their concern, but should have their attention focused exclusively on their duty as fact finders, which in a criminal case is simply to determine guilt or innocence. It is for similar reasons that we exclude from the jury's reckoning such eminently practical considerations as the presence or absence of insurance, the amount of attorney fees, and in some cases the trebling of damages.

We cannot say that the incorporation of the verbatim text of the statute in the instructions, standing alone, constituted reversible error. The successor statute, now K. S. A. 1971 Supp. 22-3428, contains substantially the same provisions as former 62-1532. It has recently been amended to include the provision that: "In any case where the defense of insanity is relied on the court shall instruct the jury on the substance of this section." (L. 1971, ch. 117, § 1, effective July 1, 1971.) Instructing on the "substance" of the section can no doubt be a two-edged sword. In some cases it may assure a reluctant jury that their acquittal of an "insane" defendant will not immediately "put him on the bricks." In others it may achieve the result we perceive here, warning the jury that such a result may be achieved all too soon. We are not prepared to generalize on the

new statute in this case, for we are not presented with an instruction on the "substance" of the section.

What we find here is a combination of the court's questions and the gratuitous instruction, in all probability producing a fear of the prompt release into society of a dangerous psychotic, which may have prevented the jury from giving fair consideration to defendant's unrefuted evidence on the issue of insanity.

For these reasons the judgment is reversed and the case remanded for a new trial on the charge of second degree murder.

APPROVED BY THE COURT.