No. 46,584

The State of Kansas, *Appellee,* v. William H. Hamilton, III, *Appellant.*

(534 P. 2d 226)

Opinion filed April 5, 1975.

*Arthur H. Snyder,* of Hutchinson, argued the cause, and *Leander P. Hamilton,* also of Hutchinson, was on the brief for the appellant.

*Porter K. Brown,* county attorney, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: The tragic events giving rise to this lawsuit took place on the evening of January 2, 1971, when the defendant, William H. Hamilton, III, and Gary Buhler, his friend and fellow insurance salesman, "went out on the town", so to speak, in Hutchinson, Kansas. Their evening ended with an innocent third party dead, with Gary Buhler shot through the neck, and with the defendant Hamilton facing charges of first-degree murder and aggravated battery. The jury which heard the case returned a verdict of guilty of murder in the first degree and fixed the punishment at death. It also found the defendant guilty of aggravated battery. The defendant's motion for a new trial was overruled and he was sentenced to be executed. Subsequently the trial court amended the sentence to one of imprisonment for life on the charge of first-degree murder and also imposed a sentence of from five to twenty years for aggravated battery. The defendant, to whom we shall hereafter refer either as Hamilton, or defendant, brings this appeal.

A number of eating or drinking spots appear to have been visted that fatal evening. During their rounds Hamilton and his companion each consumed a quart of wine and an undetermined number of beers. In process, the defendant, who was armed with a derringer and carried a tear-gas pen, became unruly, displaying his pistol at one of the last places visited and discharging his tear-gas pen. On being asked to leave the establishment the two men moved on to another restaurant where Hamilton again became boisterous and Gary Buhler went outside, got in Hamilton's car, and fell asleep.

Later, at about 11 o'clock, Hamilton was driving his car south on Adams Street in Hutchinson, with Buhler in tow, when a car driven by Michael Dean Latimer pulled into the street ahead of him. Hamilton trailed the car for several blocks, blinking his lights and blowing his horn. When Mr. Latimer finally pulled over to the curb and stopped Hamilton stopped also. After stopping, Latimer and his fiancee, Gail Palstring, got out and walked to the rear of their car, where they met Hamilton as he walked up from his car. Hamilton ordered Miss Palstring to get back in the car, which she proceeded to do, but not before she heard Hamilton tell Mike Latimer that the police were after him, that he was drunk and he wanted to ride in the back seat of Mike's car. Mike refused,

stating that the back seat was full. After she got back in the car Gail heard a few mumbles and then a gun shot. Gail got out and found Mike lying face up, his head by the rear wheel, and with blood on his forehead. She attempted to pull him away from the wheel and then got in the car and drove back to the home of the couple they had just left. The manager of a nearby motel called police and officers soon arrived at the scene. They took Mike to the hospital where he died about 3 a. m. from a single shot in the head.

After shooting Mr. Latimer, Hamilton returned to his car and left in a hurry. Gary Buhler, who had been awakened by the shot, remembered seeing somebody fall and seeing Hamilton running back to his car. When Gary asked what had happened, the defendant said he fired above the boy's head to scare him, and not to worry about it. On being pressed further for an explanation, Hamilton refused to answer and offered to take Buhler to his car. Buhler agreed, and as he was leaving the car he asked again for an explanation. At this point Hamilton shot him through the neck. Hamilton was arrested and taken to the police station later that night after he had rid himself of his pistol.

Against this background we turn to the points raised by Hamilton on appeal. They are two in number (1) the trial court erred in instructing the jury (instruction sixteen) as to the legal consequences of a verdict of not guilty by reason of insanity, the effect of such instruction being so prejudicial as to deprive him of a fair trial, and (2) the verdict is unsupported by evidence in that neither premeditation nor malice was shown. We shall consider the points in order.

In drafting instruction sixteen, advising the jury with respect to the effect of a verdict of not guilty by reason of insanity, the trial court obviously was attempting to comply with the provisions of K. S. A. 22-3428 (Weeks 1974), reading as follows:

"(1) When a person is acquitted on the ground that he was insane at the time of the commission of the alleged crime the verdict shall be 'not guilty because of insanity,' and the person so acquitted shall be committed to the state security hospital for safekeeping and treatment.

"(2) Whenever it appears to the chief medical officer of the state security hospital that a person committed under this section is not dangerous to other patients, he may transfer such person to any state hospital. Any person committed under this section may be granted convalescent leave or discharge as an involuntary patient after thirty days notice shall have been given to the

county attorney and sheriff of the county from which such person was committed.

"(3) In any case where the defense of insanity is relied on the court shall instruct the jury on the *substance* of this section." (Emphasis supplied.)

Sections (1) and (2) of this statute were enacted by the 1970 legislature as part of the recent act relating to criminal procedure. (L. 1970, ch. 129.) These two sections, for practical purposes, are substantially the same in context as a former statute, K. S. A. 62-1532. Section (3), however, added a new dimension in 1971 when it was adopted by the legislature. (L. 1971, ch. 117, § 1.) It was pursuant to the mandate of section (3) that the court instructed on the effect of a not guilty verdict because of insanity and in so doing quoted, verbatim, the language of sections (1) and (2).

While the defendant now complains that instruction sixteen was prejudicial to the extent of depriving him of a fair trial, no objection was made at the trial on that ground and the record, itself, reflects no objection of any kind being lodged against the instruction. However, the state advises in its brief that Hamilton did object to the instruction, but solely on the ground that his plea of insanity was made before the effective date of the 1971 statute. Since this particular objection was not included in the specification of errors, it is not subject to being reviewed on appeal. (See cases, 1 Hatcher's Kansas Digest [Rev. Ed.] Appeal & Error, § 177.)

The only challenge now made to instruction sixteen is simply this: that it prejudiced the defendant's constitutional right to a fair trial and denied him due process. This point was not raised at the trial and the following statutes thus become pertinent: K. S. A. 60-251 (*b*) and 22-3414 (3) (Weeks 1974) both provide:

"No party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating distinctly the matter to which he objects and the grounds of his objection unless the instruction is clearly erroneous. . . . "

In the recent case of *Baugher v. Hartford Fire Ins. Co.*, 214 Kan. 891, 522 P. 2d 401, we said in this connection:

"Under K. S. A. 60-251 (*b*) no party may assign as error the giving or failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection, unless the instruction is clearly erroneous. (*Bott v. Wendler*, 203 Kan. 212, 453 P. 2d 100.)" (p. 900.)

See, also, *Flett Construction Co., Inc., v. Williams,* 210 Kan. 28, 30, 500 P. 2d 54, wherein we said that objection to instructions not presented to the trial court will not be considered by this court for the first time.

Was instruction sixteen clearly erroneous as a matter of law? We believe it was not. This conclusion is not based solely on the mandate of our own statute, for not even a statutory pronouncement may contravene constitutional due process.

Although we have not been apprised of any state, other than Kansas, having enacted a statute requiring the court to instruct as to the effect of a verdict of not guilty by reason of insanity, the question is not entirely new or novel—a good many courts around the country have had occasion to consider the problem. A majority, it would appear, have held it prejudicial to give an instruction of that kind, although other courts have taken an opposite view. (See 11 A. L. R. 3d Anno: Criminal Case—Instructions—Insanity, p. 737, *et seq.*)

We have not spoken definitively on the effect of 22-3428 (3), although in *State v. Blake,* 209 Kan. 196, 207, 495 P. 2d 905, we said that to include the verbatim text of former K. S. A. 62-1532 in the instructions was prejudicially erroneous when combined with the trial judge's cross-questioning of a defense witness. In the *Blake* opinion we carefully refrained from passing judgment on the impact of 22-3428, previously adopted but not yet in effect. We did not mean to suggest that an instruction on the substance of 22-3428, standing alone, would be clearly erroneous.

However, we did have this to say in *Blake* on the subject of prejudice: that an instruction on the substance of the statute could "no doubt be a two-edged sword. In some cases it may assure a reluctant jury that their acquittal of an 'insane' defendant will not immediately 'put him on the bricks.' In others it may achieve the result we perceive here, warning the jury that such a result may be achieved all too soon."

In our opinion, the view which was expressed in *Lyles v. United States,* 254 F. 2d 725 (D. C.), reflects a rational view of the fitness of this instruction where sanity has been placed in issue. One of the points raised in *Lyles* was whether the trial court erred in giving the following instruction:

" 'If a defendant is found not guilty on the ground of insanity, it then becomes the duty of the Court to commit him to St. Elizabeths Hospital, and this the Court would do. The defendant then would remain at St. Elizabeths

Hospital until he is cured and it is deemed safe to release him; and when that time arrives he will be released and will suffer no further consequences from this offense.'" (p. 728.)

The holding of the federal court on this point was phrased in this fashion:

"This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." (p. 728.)

The Supreme Court of Michigan in *People v. Cole,* 382 Mich. 695, 172 N. W. 2d 254, after saying it "felt" that *Lyles v. United States,* supra, was "the better reasoned authority" proceeded to hold that where the defense of insanity was present the defendant, upon his own request, or upon request of the jury, was entitled to an instruction in accord with the *Lyles* case. The court's opinion contains the following language:

"This appeal makes it mandatory that this Court choose between: (1) the possible miscarriage of justice by imprisoning a defendant who should be hospitalized, due to refusal to so advise the jury; and (2) the possible 'invitation to the jury' to forget their oath to render a true verdict according to the evidence by advising them of the consequence of a verdict of not guilty by reason of insanity.

"We conclude that the reasons given in support of the first proposition far outweigh the fear of jury integrity expressed in the second proposition." (p. 720.)

In *State v. Shoffner,* 31 Wis. 2d 412, 143 N. W. 2d 458, the trial court refused to instruct the jury as to what the effect would be should it find the defendant not guilty by reason of insanity. As to this issue the Wisconsin court observed it would have preferred

the instruction be given although it did not consider its refusal to have been prejudicial error.

*Kuk v. State,* 80 Nev. 291, 392 P. 2d 630, is quite to the point. In that case, the trial court instructed the jury that if defendant was found not guilty by reason of insanity, the finding would have the same effect as if he were regularly adjudged insane and he would be ordered confined to the Nevada State Hospital until regularly discharged according to law; and that if confined in the state hospital, the defendant might be discharged if, in the opinion of the hospital superintendent, he had recovered from his mental illness. On appeal, the Nevada Supreme Court held it was not reversible error "to instruct the jury about the consequences of a verdict of not guilty by reason of insanity."

In *State v. Wade,* 96 Conn. 238, 113 A. 458, the appellate court said it was within the discretion of the trial court to instruct with regard to the effect of acquittal on the ground of insanity but the court's refusal to give such a charge upon request could not be assigned as error, since the judgment to be entered on the verdict was for the court.

While we cannot say instruction sixteen was clearly erroneous as a matter of law, we believe it went further than the legislature had intended. K. S. A. 22-3428 (3) (Weeks 1974) does not require that the statute be quoted *verbatim,* only that the jury be instructed as to its *substance.* The statute provides, in part, that a person committed thereunder may be granted convalescent leave or discharge as an "involuntary patient" after thirty days notice to the county attorney and sheriff. The conditions under which an "involuntary patient" may be discharged or given convalescent leave and the procedures therefor are not set out in 22-3428; resort must be had to other statutes. (K. S. A. 1974 Supp. 59-2924.) We cannot presume a legislative intent that all the statutory details be incorporated in an instruction to the jury. In the *Lyles* case the court commented that "a recitation of the statutory procedure in great detail, such as reading the entire section of the statute" might tend to be confusing. It is our opinion the legislature intended only that the jury be apprised that the defendant, if found not guilty because of insanity, would be committed to the state security hospital for safekeeping and treatment until granted discharge or convalescent leave as provided by law. This seems to us to be the substance of the statute and we believe an instruction to such effect will fulfill the spirit of the law.

At oral argument, Hamilton's counsel advanced the contention, as we understood him, that instruction sixteen was unfair because qualified medical testimony as to the defendant's sanity was lacking. We cannot agree with this assessment of the evidence. Two experienced members of the Larned State Hospital staff, both medical doctors with special training in psychiatry or neurology, testified on behalf of the state on the issue of sanity, while two specialists connected with Menninger Foundation, one a board certified psychiatrist, the other a clinical psychologist, were witnesses for the defendant. Each of the four doctors had examined Mr. Hamilton personally and each was familiar with his past unorthodox history. While there were some differences in the background, experience and training of the doctors, and while the doctors for the state reached different conclusions than did those for the defendant, we cannot say the court erred in permitting all of them to testify as experts and to express their opinions in such capacity. As we see it, there was an abundance of testimony from competent witnesses to permit the jury to infer that Mr. Hamilton was sane at the time of the homicide.

The defendant's final point goes to the sufficiency of the evidence to establish the elements of malice and premeditation, both essential components of first-degree murder as defined in K. S. A. 21-3401. (Weeks 1974) It is argued on behalf of defendant that he and the deceased were complete strangers, rebutting any inference of malice or premeditation.

This court has long held to the rule that malice in law may be inferred from the fact that a deadly weapon was used in a homicide. (*State v. Earnest*, 56 Kan. 31, 38, 42 Pac. 359; *State v. Dull*, 67 Kan. 793, 799, 74 Pac. 235; *State v. Smith*, 78 Kan. 179, 183, 96 Pac. 39; *State v. Donahue*, 197 Kan. 317, 319, 416 P. 2d 287; *State v. Blake*, supra, 202.) These cases accord with the view generally accepted in this country. (40 C. J. S. , Homicide, § 78, p. 942.)

Whether premeditation may also be inferred from use of a deadly weapon is not so clear. As a general principle it would seem that use of a deadly weapon, standing alone, is not sufficient to establish premeditation. (1 Wharton's Criminal Evidence, 13th Edition, § 135.) In an annotation contained in 96 A. L. R. 2d, Homicide—Premeditation, § 3, p. 1439, we find this statement of the rule:

"It appears to be generally agreed that the fact that the killing was effected by the use of a deadly weapon is not, of itself, a sufficient basis for a legal presumption that it was deliberate or premeditated. . . ."

While use of a deadly weapon is not alone sufficient to infer premeditation it is one of the circumstances which may be considered in determining whether a homicide was committed with deliberation. We find this discussion set out in 1 Wharton's Criminal Evidence, supra, pp. 226, 227:

"According to some courts, if, in addition to the use of a deadly weapon, another circumstance is shown, such as the lack of provocation, the evidence may be of such probative force as to give rise to a presumption, as opposed to a mere inference that the homicide was premeditated and deliberate, thereby casting upon the defendant the burden of going forward with appropriate evidence to explain away such presumption. According to other courts, the existence of premeditation and deliberation which will raise the homicide to murder in the first degree may not be the subject of a legal presumption, but is a matter of inference which the trier of fact may or may not see fit to draw.

"Premeditation and deliberation can be found from various circumstances, such as the nature of the weapon used, the lack of provocation, the defendant's conduct before and after the killing, . . ."

We believe the circumstances surrounding the homicide in this case, which included the use of a deadly weapon, were sufficient for the jury to infer premeditation as well as malice. The victim was unarmed and the attack upon him was unprovoked. After the shooting Mr. Hamilton disposed of his gun. From defendant's actions in following the victim's car, honking his horn and blinking his lights, it is not too much to assume he was angry and intended to pick a quarrel, by telling a cock and bull story and demanding to ride in the victim's car. In a very early case, *State v. Kearley*, 26 Kan. 77, we said:

". . . If one party seeks an interview with another, arming himself for the encounter, intending deliberately that such other shall do some certain thing, or failing to do that, that he will kill him, such conditional intent is sufficient, if carried into effect by the homicide of the latter, to make murder in the first degree." (p. 85)

In *State v. Greenwood*, 197 Kan. 676, 421 P. 2d 24, where the defendant shot his girl friend with whom he had quarreled, we said that "the record discloses an abundance of evidence for the jury to draw an inference of premeditation and malice aforethought, as well as an intent to kill the deceased." (p. 686.) The same may be said in the instant case in view of all the circumstances.

The judgment of the court below is affirmed.

FROMME, J., not participating.