No. 48,018

State of Kansas, *Appellee,* v. David Wright, *Appellant.*

(549 P. 2d 958)

Opinion filed May 8, 1976.

*J. R. Russell,* of Kansas City, Kansas, argued the cause and was on the brief for the appellant.

*Dennis L. Harris,* deputy district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Nick A. Tomasic,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

Owsley, J.: This is a direct appeal from a jury conviction of two counts of murder in the first degree, as defined by K. S. A. 21-3401. The facts are not disputed. On the evening of January 23, 1973, defendant David Wright left his mother's house and went to the apartment of Alfred and Catherine Frazier. A short time later he left the Fraziers to get some beer. Before he returned

to the Fraziers he stopped at his house and got his knife. After they all drank beer and liquor for a while, Catherine retired for the night in an adjoining bedroom. According to defendant's testimony he "blacked out" and the next thing he remembered he was sitting on the couch next to the bloody body of Alfred. He then looked in the kitchen and saw Catherine's blood-stained body lying on the floor. Defendant went home, changed his clothes, and went to a friend's house to have another beer. Later that night he telephoned his sister, Fannie Blanton, to tell her he "had done something bad" and had killed somebody. He then went to her home where he repeated his account of the killings. He next called Joe Jones, a psychiatric social worker who had been seeing him for more than a year, and told him he had killed two people. Upon Jones' advice, defendant then called the police and reported the murders. When the police arrived defendant led them to the Fraziers' apartment where they found the bodies of Alfred and Catherine with numerous stab wounds. The police found defendant's knife and a bloody shirt in the kitchen. Defendant was immediately placed under arrest and advised of his constitutional rights. He was taken to the police station and upon interrogation he confessed to the murders.

On February 9, 1973, defendant was given a medical examination by a court appointed psychiatrist. He was found incompetent to stand trial and was committed to the state hospital. In May, 1974, it was determined that defendant was capable of assisting in his own defense and he was thereafter tried and convicted of both counts of first degree murder. On appeal, defendant raises four points of error.

First, defendant contends the trial court erred in refusing to suppress all confessions and statements made by him after his arrest, for the reason that he lacked the mental capacity to waive his constitutional right to remain silent. The statements to which he objects consisted of a written and oral confession given at the police station. The substance of these statements was to the effect that he stabbed Alfred several times, then went into the bedroom and stabbed Catherine. Although defendant did not recall dragging Catherine's body into the kitchen he did remember taking off his shirt since it was bloody. Defendant admitted that the knife found in the kitchen was the one he used to kill the Fraziers.

Defendant's motion to suppress his confessions was submitted

to the trial court on the transcript of the preliminary hearing. After considering the testimony the trial court made the following finding in denying the motion:

"Mental illness or a dull intelligence is not per se a bar to the admissibility of a confession. It is only one of several factors to be weighed in the context of the total circumstances in determining whether the confession was the product of a free will, or of an irrational mind, or was one resulting from coercion.

"In this case the defendant did call his sister and report the incident, he led the officers to the scene, he was able to talk to his sister and a Mr. Jones and gave no indication at the time that he did not understand what he was doing. There was no overreaching or unfairness shown on the part of the police. Defendant's sister was present. The burden of proof at the trial, of course, will be upon the State to prove that he understood what he was doing and was not criminally irresponsible at the time of the offense or when he confessed. The matter will then be submitted to a jury under appropriate instructions by the court."

It is defendant's position on appeal that he did not have the mental capacity to waive his constitutional rights as demonstrated by his long history of mental illness, his disorganized mental state at the time of the arrest, and the fact he was found insane by the court appointed psychiatrist. In contrast, the state points to the fact defendant admitted his guilt on numerous occasions prior to the taking of the formal confessions; that defendant was advised of his constitutional rights several times; that defendant said he understood his rights and signed the waivers; and that numerous witnesses testified defendant appeared to understand the questions.

To be admissible a confession must have been freely and voluntarily given without compulsion or duress. The determination of the voluntariness of a confession should be based upon a consideration of the totality of the circumstances. ( *State v. Jones,* 218 Kan. 720, 545 P. 2d 323; *State v. Soverns,* 215 Kan. 775, 529 P. 2d 181; *State v. McVeigh,* 213 Kan. 432, 516 P. 2d 918; *State v. Milow,* 199 Kan. 576, 433 P. 2d 538.) The test to be applied in determining the mental capacity of an accused to make an intelligent and voluntary confession is the same as that used for determining an accused's criminal responsibility for committing the crime. It is commonly referred to as the *M'Naghten* test and it requires a finding that at the time of making a confession the accused was incapable of distinguishing right from wrong so as to excuse him from the legal consequences of his acts. ( *State v. Pyle,* 216 Kan. 423, 532 P. 2d 1309; *Andrews v. Hand,* 190 Kan. 109, 372 P. 2d 559.) In the absence of a determination of insanity satisfying the

*M'Naghten* standard, the mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but it is not necessarily conclusive; its weight is for the trier of fact. (*State v. Pyle*, supra; *State v. Brunner*, 211 Kan. 596, 507 P. 2d 233.) In the instant case the trial court found the evidence of defendant's mental incompetency was insufficient to suppress the confessions. That finding is binding on this court if it is supported by substantial competent evidence.

The record contains the testimony of several witnesses who had contact with defendant shortly before he gave the challenged confessions. Defendant's sister described defendant as appearing normal when he arrived at her house on the night in question and later at the police station. The psychiatric social worker testified that when he saw him on the night of the murders defendant "seemed a little tense, but he seemed to be well aware of his environment and well aware of facts, and he seemed more rational than he had been in the past." He felt that at the time he saw him defendant had good contact with reality. Upon further questioning the witness Jones said:

"Q. [By assistant district attorney] Would you say he had enough reality contact at that time that he could tell the difference between right and wrong or can you answer that?

"A. [By Jones] It's kind of hard to answer that, because a person with that kind of diagnosis—one of the problems would be perception and judgment.

"Q. Did he have any perception at that time?

"A. He seemed to know that he had been involved in something. He seemed aware of what was going on at that time.

"Q. Did he have any judgment at that time or judgment values at that time.

"A. Well, he made a judgment to—I think by calling, by being at his sister's house and by talking to her about what he had done and by calling me, I think he made a judgment. I think he understood something bad had been done."

The arresting officers testified they read the *Miranda* warning to defendant, who responded that he understood his rights. After defendant was taken to the police station he was again advised of his rights and he said he understood them. He also signed the waiver of rights form. The record discloses that defendant's sister was also in the interrogation room with him. Both officers who testified thought defendant was competent at the time he confessed.

The court appointed physician, Warren G. Phillips, examined defendant on February 9, 1973, sixteen days after the murders. Dr. Phillips diagnosed defendant on the day he examined him as

being actively psychotic and incompetent to stand trial. In his opinion, defendant could not distinguish between right and wrong at that time. When asked whether defendant had the same mental problems on January 23, 1973, he replied:

"The same diagnostic label, I think, would be placed on David on that date. Yes. Whether he was in contact with reality or out of contact with reality, I wouldn't know."

He stated that the condition could have changed for the better or worse since the incident. Dr. Phillips, however, was unable to say whether defendant could distinguish between right and wrong on the night of the murders.

We are especially persuaded by the conduct of defendant after he committed the murders. He went home, changed his clothes, and went to a friend's house for another beer. When defendant telephoned his sister he told her he "had done something bad." This alone indicates defendant's awareness of the nature of his acts. There was no evidence of any overreaching or coercion on the part of the police in obtaining the confessions. From all the evidence it appears defendant's statements were given freely and voluntarily. Under these circumstances we conclude the trial court properly permitted the introduction of the evidence of defendant's confessions.

Defendant also contends the trial court committed error by admitting certain photographs of the victims taken at the scene of the crime. He argues the photographs were shocking, gruesome, and served no purpose other than to inflame the minds of the jury. No copies of the photographs were included in the record, nor were any filed with this court. In the absence of such evidence it is impossible for us to review this point. An issue will not be considered on appeal where its existence depends on facts which do not appear in the record. (*State v. Jones*, 214 Kan. 568, 521 P. 2d 278; *State v. Brothers*, 212 Kan. 187, 510 P. 2d 608.)

Objection is also made to the following instruction given to the jury:

"A person found not guilty because of insanity is committed to the State Security Hospital for safekeeping and treatment. Whenever it appears to the chief medical officer of the State Security Hospital that the person committed is not dangerous to other patients, he may transfer the person to any state hospital, grant convalescent leave or discharge the person as an involuntary patient after thirty days notice has been given to the county attorney and sheriff of the county from which the person was committed."

Defendant acknowledges the foregoing instruction was taken from

PIK Criminal 54.10-A; however, he argues it is not a proper matter for jury consideration since it gives the impression that a defendant found not guilty because of insanity can be released from custody upon the whim of the chief medical officer. The instruction given by the trial court was an obvious attempt to comply with the mandate of K. S. A. 22-3428 (now K. S. A. 1975 Supp. 22-3428), which requires the court to instruct the jury with respect to the effect of a verdict of not guilty by reason of insanity. In the recent case of *State v. Hamilton,* 216 Kan. 559, 534 P. 2d 226, we construed the provisions of this statute and held that section (3) thereof "does not require that the statute be quoted *verbatim,* only that the jury be instructed as to its *substance.*" The trial court in *Hamilton* had instructed the jury on the effect of a not guilty verdict because of insanity and in so doing it quoted verbatim the language of sections (1) and (2) of K. S. A. 22-3428. The defendant in that case claimed the instruction given by the court deprived him of a fair trial. On appeal, we noted that no objection on that ground was raised at trial. Applying the rule of law expressed in K. S. A. 22-3414 (3), we reviewed the authority from other jurisdictions to determine whether the instruction was "clearly erroneous" as a matter of law. The view adopted by this court as to the propriety of this instruction where the accused's sanity has been placed in issue was the same as that set forth in *Lyles v. United States,* 254 F. 2d 725 (D. C. Cir. 1957), which held that the jury had the right to know the meaning of a verdict of not guilty by reason of insanity since it was a matter not within the common knowledge. Accordingly, we held in *Hamilton* that the instruction given by the trial court was not clearly erroneous, although it did go further than the legislature intended. We said:

". . . The statute [K. S. A. 22-3428] provides, in part, that a person committed thereunder may be granted convalescent leave or discharge as an 'involuntary patient' after thirty days notice to the county attorney and sheriff. The conditions under which an 'involuntary patient' may be discharged or given convalescent leave and the procedures therefor are not set out in 22-3428; resort must be had to other statutes. (K. S. A. 1974 Supp. 59-2924.) We cannot presume a legislative intent that all the statutory details be incorporated in an instruction to the jury. In the *Lyles* case the court commented that 'a recitation of the statutory procedure in great detail, such as reading the entire section of the statute' might tend to be confusing. It is our opinion the legislature intended only that the jury be apprised that the defendant, if found not guilty because of insanity, would be committed to the state security hospital for safekeeping and treatment until granted discharge or convalescent leave as provided by law. . . ." (p. 565.)

In the instant case no objection to the instruction given by the trial court appears in the record, nor was it mentioned in defendant's motion for a new trial. Consequently, we cannot assign error to the giving of the instruction unless it was clearly erroneous. (K. S. A. 22-3414 [3].) This issue has previously been resolved in *Hamilton* and need not be discussed further. The trial court did not commit reversible error by instructing the jury as to the consequences of a finding of not guilty by reason of insanity. We note with approval, however, that PIK Criminal 54.10-A on which the trial court based its instruction has been revised in the 1975 Supp. to read:

"A person found not guilty because of insanity is committed to the State Security Hospital for safekeeping and treatment until discharged according to law."

As his final point defendant contends there was not sufficient evidence to support the verdict of guilty of first degree murder. In particular, defendant claims there was no evidence of malice, willfulness, deliberateness or premeditation. Murder in the first degree is statutorily defined as "the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony." (K. S. A. 21-3401.) The elements of malice and premeditation are essential to a conviction of murder in the first degree, but it is well established that malice may be inferred from the fact that a deadly weapon was used in a homicide. (*State v. Hamilton,* supra; *State v. Blake,* 209 Kan. 196, 495 P. 2d 905; *State v. Donahue,* 197 Kan. 317, 416 P. 2d 287.) We have said that while use of a deadly weapon is not sufficient to infer premeditation it is one of the circumstances which may be considered in determining whether a homicide was committed with deliberation. (*State v. Hamilton,* supra.)

In the instant case the physical evidence, plus defendant's various statements and confessions after the murders, provides ample evidence from which both malice and premeditation can be inferred. According to defendant's own testimony, when he was out shopping for beer he stopped by his house and picked up the knife he used to kill the Fraziers. Later, defendant took out his knife and stabbed both of them to death. All the evidence indicated it was an unprovoked attack. When all the circumstances are considered, together with the fact he used a deadly weapon, we believe there

was sufficient evidence to support the conviction of first degree murder.

Having found all points raised by defendant to be without merit, the judgment of the trial court is affirmed.