THE STATE OF KANSAS v. FRANK J. EARNEST.
No. 10374.

1. HOMICIDE—*Malice—Instructions.* On the trial of a person charged with murder, the jury ought not to be instructed that the killing with a deadly weapon being admitted, the presumption therefore is that such killing was done with malice, and that this presumption stands until it is rebutted by evidence. It would be better to instruct them that malice may be inferred from the fact of killing with a deadly weapon, and that they should consider this circumstance in connection with all the other evidence in the case for the purpose of determining whether the act was malicious or not.

2. —— *Instructions—Judgment, When not Reversed.* On the trial of a charge of murder, where the defendant admitted that he shot and killed the deceased with a pistol, but claimed that he acted in self-defense, and the testimony of the state tended to show that he shot and killed the deceased while he was quietly sitting in a chair, because the deceased had accused him of being connected with cattle stealing, where the jury is fully and correctly instructed with reference to what constitutes murder in the first and second degrees, and the various degrees of manslaughter, and also in reference to the right of the accused to defend himself, and where the jury are clearly and pointedly instructed that the defendant is presumed innocent of crime, and of every element of criminality, and that the burden rests on the state to prove beyond a reasonable doubt every ingredient of the offense charged, the judgment will not be reversed because the court charged that "the killing with a deadly weapon is admitted by the defendant. The presumption therefore is, that such killing was done with malice. This presumption stands until rebutted by evidence showing that the killing either resulted by passion produced by sufficient provocation, or by evidence that the killing took place under such circumstances that excused the defendant in taking the life of the deceased"; it being clear under the testimony in this case that the act was willful murder if the defendant's testimony that he was assaulted by the deceased was untrue.

3. OPINIONS *of Witnesses as Evidence.* The opinions of witnesses are in general admissible only as to matters concerning which they have superior knowledge and ability to judge; but the expression of an opinion by a physician on the witness-stand as to a matter concerning which he was not interrogated, furnishes no ground of error, where no motion is made to strike it out.

4. EVIDENCE *to Identify Persons— Question for Jury.* A witness and the defendant having had a conversation with reference to the acts, statements and conduct of a third person, whose name was not mentioned during the conversation, said witness, after detailing the conversation and so much of the matters referred to in the conversation as tend to identify the person referred to, may name the person he referred to in that conversation. It is then for the jury to determine from all the evidence, whether the defendant also referred to and understood the witness as intending the same person.

5. JUDGE PRO TEMPORE—*Adjournment of Court.* The mere fact that a judge *pro tempore* attempts to adjourn court to a future day, before he has taken the oath of office, does not vitiate an order made after he has been duly sworn, shortly afterward, and on the same day, adjourning court to the same time as first directed.

*Appeal from Clark District Court.*

FRANK J. EARNEST, convicted of murder in the first degree, appeals. All the material facts are stated in the opinion herein, filed November 9, 1895.

*H. J. Bone,* and *Ben. E. Page,* for appellant; *Waggener, Horton & Orr,* of counsel.

*F. B. Dawes,* attorney general, and *J. M. Grasham,* county attorney, for The State.

The opinion of the court was delivered by

ALLEN, J.: The defendant was charged with and convicted of the premeditated murder of Sidney J. Jackman, in Clark county, on the 29th of January, 1895. He testified in his own behalf, and was examined and cross-examined at great length: His statement of the circumstances immediately connected with the tragedy is in substance as follows : That he came up town in Ashland, where both he and the deceased resided, about 10 o'clock in the morning ; that he saw the deceased in front of the butcher shop, which he had formerly owned, and which was then occupied by

Charles Foster, and that Jackman spoke to him, saying, that "Lyons and the other fellows are going to be in this evening"; that Lyons was a cattle inspector of the Texas association; that they were going to try to take a steer away from him, and that he would not give him up — would kill them first; that they went into the butcher shop and drank some whisky from a bottle Jackman had in his pocket. There were two rooms to the butcher shop, the front room in which meat was kept, and a small back room in which there was a stove with a fire in it, used as a kind of loafing room. In the southwest corner there was a writing desk, and north of it a trunk. Some other parties came in while they were in this small back room, including Tom Jackman, a brother of the deceased, who also produced a four-ounce bottle of whisky, which they drank. All the others then went out except the defendant, the deceased, and Foster. Jackman proposed that they should all chip in and get some more whisky. Jackman gave 10 cents and the defendant a quarter to Foster to buy whisky. When Foster went out to get the whisky, Jackman was sitting on the west side of the stove and a little to the south of it. The defendant was sitting on the north side of the room. The defendant states:

"When Mr. Foster went through the middle door, he shut the door, and I heard the money-drawer. Sid. said, 'Who is that?' and I raised up off my seat and looked through the window in the door.

"Ques. There is a window in the door between the back room and front room? Ans. Yes; a little one.

"Q. Just one pane of glass? A. Yes, sir. I told him it was Foster. . . . I turned around to the water bucket that sat on the counter next to the east side of the back room and took a drink.

"Q. What then? A. I turned back to the stove.

3—56 KAS.

"Q. How? A. Turned around and went back of the stove.

"Q. Facing it? A. Yes, sir.

"Q. How near were you to the stove? A. I walked up and just put my foot up on the 2x4 as it is around the stove.

"Q. Which foot, do you remember? A. My right foot.

"Q. Where was Sid. at that time? A. He was sitting across at the southwest side of the room.

"Q. What, if anything, did you say at that time? A. I said, 'Sid. you are trying to break up my family, and you said that if I interfered that you would kill me, now what are you going to do about it?'

"Q. What, if anything, did he say? A. He ris this way [indicating with his hand] and said 'God damn you, I will kill you,' and I jerked the pistol out of my pocket and shot, and he jerked back this way as I shot, and fell, looked to me as though he hit the chair and went over this way against the trunk, and kind of doubled back and was in the corner.

"Q. Doubled back between the trunk and stove? A. Yes, sir.

"Q. I will ask you whether or not he struck the chair in falling? A. I think he did. That is the way it looked to me.

"Q. You saw when he rose, what, if anything, did he have in his hand? A. It looked like a knife when I saw it, after his hand got up. . . .

"Q. How did you happen to shoot the second shot? A. Because I thought he was getting his gun, then when he jerked his hand down — just as he threw his hand down, I shot again."

The defendant then went out through the front room of the butcher shop to the street. Foster testifies that having heard the shots he came back and met the defendant just inside the outside door of the shop; that the defendant then said to him "Do n't go in. I had to do it. I was too quick for him or he would have got me"; that when he left the back room Jackman

was sitting on a common stool chair southwest of the
stove, his left foot on the iron ash-box forming the
lower part of the stove, with his right foot crossed
over it, leaning back ; that he had a pair of pants ly-
ing across his lap rolled up in a roll ; was whittling a
stick with a small penknife ; that when he came in he
found Jackman lying with his face down, west and a
little north of the stove, his left hand under him, the
pants between his left arm and his body, his right
hand lying at his side, and the knife on the floor near
by ; that his left foot was still on the box part of the
stove a little farther to the north, and his right foot
was thrown over to the north side of the stove.  Two
ball holes were found in the body, one to the right
and the other to the left of the breast-bone, and two
spots were found on the back, apparently caused by
bullets.  The spots on the back were about five or six
inches lower than the ball holes in the breast.  The
doctors testified that the ball must have passed
through the heart, and that death was instantaneous.
The theory of the prosecution was that Jackman had
been giving information to the sheriff of cattle-steal-
ing operations with which the defendant was con-
nected, and that the defendant sought this occasion
to kill him and get him out of his way.  The claim
of the defendant was that Jackman was intimate with
his wife, and, when the subject was mentioned by
Earnest, attacked him in the manner detailed by the
defendant on the witness-stand, and that he shot him
in self-defense.

The principal claim of error is in giving the sixth
instruction, which is as follows :

"In this case the killing with a deadly weapon is
admitted by the defendant.  The presumption there-
fore is that such killing was done with malice.  This
presumption stands until it is rebutted by evidence

showing that the killing either resulted by passion produced by sufficient provocation, or by evidence that the killing took place under such circumstances that excused the defendant in taking the life of the deceased.''

Many authorities are cited by counsel for the state supporting the instruction as given, and some even go much farther.   The supreme court of Massachusetts, in the case of *Commonwealth v. York*, 9 Metc. 93, in an elaborate opinion affirmed an instruction as follows :

''The rule of law is, when the fact of killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it is malicious and an act of murder.   It follows, therefore, that in such cases the proof of matter of excuse or extenuation lies on the accused, and this may appear either from evidence adduced by the prosecution or evidence offered by the defendant.''

The supreme court of Ohio, in the case of *Davis v. The State*, 25 Ohio St. 369, said :

''The charge of the court, that malice is to be intended from the fact of killing, and that circumstances of justification or extenuation, not disclosed by the evidence adduced against him, are to be made out by the accused, is in our opinion unexceptionable, and the well-settled law of such cases.''

In 2 Bishop on Criminal Law, § 680, it is said :

'' As general doctrine, subject, we shall see, to some qualifications, the malice of murder is conclusively inferred from the unlawful use of a deadly weapon resulting in death.''

In the case of *The State v. Mahn*, 25 Kan. 184, it was held not error to refuse the following instruction :

''The jury are further instructed that the fact alone, by itself, that the deceased was killed by defendant, is not sufficient to establish a malicious intent.''

It was said in the opinion :

" In many cases the above instruction would be good law, but in the present case it would be misleading and erroneous. In the present case, the fact of killing was not the only fact that tended to show a malicious intent on the part of the defendant."

Notwithstanding the numerous authorities affirming the proposition of law contained in the instruction given in this case, we think it subject to criticism, and that the jury should never be told that malice or any other element of crime is presumed from any one fact, or partial group of facts in the case. Nor should they be told that a presumption arising from one act stands until rebutted by evidence. A criminal case is not to be severed into parts by the court, so that the prosecution, having established by evidence certain facts, is relieved from the burden of showing other essential elements of criminality. The true rule, as heretofore established by this court, in cases like the one under consideration, is that the burden of proving the guilt of the defendant and every element of crime rests on the state throughout every stage of the trial, and that all the evidence introduced on both sides is to be considered by the jury in arriving at a verdict of guilty, or not guilty. The presumption of malice arising from the use of a deadly weapon with deadly effect is not properly to be deduced by the court as a matter of law, but is to be inferred by the jury as a matter of fact, because the secret purposes of the mind can only be made manifest through external acts and expressions. As the conduct of a sane person is directed by the will, he is presumed to act intelligently, and to intend that those results shall follow each act that are known by everybody to be the natural and inevitable effects of such acts. In a prosecution for homicide a case can

scarcely be conceived in which the only proof bearing on the motive of the accused is of the bare fact that he committed the homicide with a deadly weapon. In the nature of things there must be other facts and circumstances indicative of his purpose. Instead of directing the jury that a presumption arises merely from one or more facts proven, and thereby conveying to their minds the impression that they may cease to inquire further and assume malice as proven, it would be better to instruct them that they may infer malice from an intentional killing with a deadly weapon; but that this, like every other element of crime, is to be determined from all the evidence in the case. But while we do not approve of this instruction, and think it subject to just criticism, it does not follow of necessity that the judgment should be reversed on account of it. As was well said by the supreme court of Indiana in the case of *Boyle v. The State*, 105 Ind. 469, "Instructions are not to be disposed of by a process of dissection, but are to be taken as a whole." It cannot be claimed in this case that the jury were left with the impression that there was a presumption of guilt resting on the defendant throughout the case because of the conceded facts, and that it was incumbent on him to prove his innocence.

1. Homicide— malice— instructions.

2. Instructions —judgment, when not reversed.

By the nineteenth instruction the jury were told that the defendant was presumed innocent of the charge, and that this presumption should continue in his favor until every ingredient necessary to constitute the offense was proved beyond reasonable doubt. And by the twentieth instruction they were further told that the burden of proof rested on the state to establish every ingredient of the offense, and that so

long as a reasonable doubt of his guilt remained he must be acquitted; that doubt as to two or more degrees of an offense must be resolved in favor of the lower degree. They were fully instructed with reference to murder in the second degree, the various degrees of manslaughter, and justifiable homicide. They were fully informed of the defendant's right to defend himself if he were attacked by the deceased, as claimed by him. The law of self-defense was given in terms as favorable to the defendant as it has ever been declared by any court within our knowledge. There is nothing in the evidence calculated to raise a doubt that the killing was done with malice, and was premeditated, unless it was done in self-defense. The testimony disclosed no middle ground on which the jury could fairly base a verdict finding the defendant guilty of any offense less than murder. The defense rested almost entirely on the testimony of the defendant himself and of other witnesses to his previous peaceable disposition. On the part of the state, many circumstances were shown tending strongly to prove that the defendant shot Jackman while he was sitting in his chair, and that this claim that Jackman raised up and assaulted him was a bare fabrication, invented for the purpose of shielding himself from the punishment due his crime. Among the strongest circumstances may be mentioned the position of the body, with the left foot still on the base of the stove, and the other parts in the position in which they would naturally have been found if he had been shot while sitting in his chair and had fallen over dead. The pants which had been lying across his lap were between his body and his arm. If he had raised up from his chair to attack the defendant with his knife, it would seem altogether probable that they would

have been thrown aside or dropped at his feet.   If he was sitting in his chair when shot, the fact that the bullets ranged downward is accounted for; while if he were standing up with his arm raised to strike with a knife, being a tall man, it would seem probable that the balls would go straight into his breast. Other circumstances not necessary to here mention tended to support the theory of the state.   We are unable to perceive how the defendant could have been prejudiced by the instruction complained of.

Objections were made to questions asked Doctor Workman calling for an opinion as to whether Jackman's body when found was in the position it naturally would have been in if he had rolled out of his chair when shot.   Conceding that this was not a proper subject for a medical expert to express his opinion upon, the answer is so indefinite that it could not have had any appreciable weight with the jury. "There would be no reason why he should roll to one position more than another by the position he was sitting in.   I do think, though, from the position of the foot on the fender, that it is not at all likely that he could have fallen from a standing position." The last part of the answer was inadmissible, but it was hardly responsive to the question, and no motion was made to strike it out.

3. Opinions of witnesses as evidence.

Complaint is also made with reference to the evidence of the sheriff, Ravenscraft, as to a conversation had between himself, the defendant, and his partner, Murphy, a short time before Jackman was killed. This conversation related to charges of cattle stealing that had been made against the defendant and his partner.   In this conversation a person whose name was not mentioned was referred to as having given

information to the sheriff. Various references were
made to this third person, and the sheriff stated that
it seemed to be understood by all of them who was
meant, though his name was never mentioned. The
sheriff was then asked whom he referred to as the
person who had given him information, and who had
interfered with a sale of cattle by the defendant and
his partner. This was objected to as being incompe-
tent. The objection being overruled, the witness
answered, "Sidney Jackman." Objection was made
also to the whole subject-matter of this testimony as
being irrelevant to the issue. We think it was com-
petent for the state, in order to show a motive for the
defendant to kill Jackman, to prove that Jackman
had been charging the defendant with a crime, had
been giving information to the sheriff, and otherwise
interfering in the defendant's affairs. And where in
a conversation a third party is referred to whose name
is not given, as in this case, after showing the facts
and circumstances which tend to point out the third
person referred to, it is proper for the witness to name
the person he referred to. In doing so, he does not
give an opinion, but states a fact within his own
knowledge. In this case both the defendant and his
partner, Murphy, testified with reference to this conver-
sation, and that they did not refer to Sidney Jackman
at all; that the third person they meant was Thomas
Jackman. If the jury believed, either that Thomas
Jackman was the person referred to, or that there was
a misunderstanding — the sheriff referring to one, and
the defendant and his partner to another — then, of
course, the evidence would be without
force against the defendant; but it was
for the jury to say, from all the evidence,
who was in fact referred to, and whether
or not the parties did fairly understand each other.

4. Evidence to
identify per-
son—question
for jury.

No error was committed in the admission of this evidence.

There is no force in the claim that the court lost jurisdiction because the judge *pro tem.*, who was elected on the 4th of June in the absence of the district judge, attempted to adjourn court before taking the oath of office. It appears that his attention was soon called to the omission; that he thereupon duly took and subscribed the oath of office, and made a proper order adjourning the term to the same day and hour as first announced. Whether the first adjournment was valid or invalid, the second was unquestionably valid, and the term was properly held at the time to which the adjournment was made. This case is not at all similar to that of *In re Terrill*, 52 Kan. 29.

5. Judge pro tem.—adjournment of court.

A motion for a new trial was made, and numerous affidavits and the oral testimony of several witnesses were introduced in support thereof. The only newly-discovered evidence which appears to be important, disclosed by the testimony, is mere hearsay. Jacob Haindel states what he heard L. J. Wood say — that Jackman had made a certain threat against Earnest. Wood's affidavit was not presented. S. H. Lackey testified as to what one Frank Dudley had told him he knew about the matter. This was the baldest kind of hearsay, and altogether inadmissible for any purpose. No good reason is shown why W. G. Curtis, who helped take care of the body of Jackman, could not have been called as a witness at the trial. The affidavits with reference to what jurors said as to the basis of their verdict were inadmissible for the purpose of impeaching the verdict. The showing was wholly insufficient to warrant the granting of a new trial.

. We find nothing in the record warranting an inter-

ference by this court with the judgment that was rendered. It is therefore affirmed.

MARTIN, C. J., concurring.

JOHNSTON, J., dissenting as to the law declared in the second and fourth propositions of the syllabus and the corresponding portions of the opinion.