No. 61,321

STATE OF KANSAS, *Appellee,* v. JOHN E. BEEBE, *Appellant.*

(766 P.2d 158)

Opinion filed December 9, 1988.

Charles D. Dedmon, assistant appellate defender, argued the cause, and Benjamin C. Wood, chief appellate defender, was with him on the brief for appellant.

Mike Ward, county attorney, and Robert T. Stephan, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: John E. Beebe appeals his jury trial convictions of first-degree murder (K.S.A. 21-3401), and of aggravated kidnapping (K.S.A. 21-3421).

From the evidence at trial, the facts underlying these brutal and senseless crimes may be summarized as follows. On the evening of January 1, 1987, Lawrence Leland Capps left his mother's home in Andover to do his laundry. Mr. Capps was eighteen years old. He stopped at a friend's apartment in Augusta and stayed there from 9:00 p.m. until after midnight. He returned to the apartment shortly after his departure, stating that he had car trouble. The friend offered to let him stay the night but the young man declined. Mr. Capps then went to a pay phone on the street below to telephone his father for a ride home.

While Mr. Capps was in the telephone booth, a pickup truck stopped. The truck was owned by Billy Horton. Horton, Billy Mathis, and defendant were in the truck. Mr. Capps was offered a ride home and climbed into the back of the truck. The truck's three original occupants were in the truck seat. On the way to Andover, the three decided to rob Mr. Capps. The truck was driven to a deserted farmhouse. Capps became alarmed and commenced hitting and kicking the rear window of the truck. At the farm the three men beat Capps and Mathis took the victim's billfold and some change from a pocket. Defendant had a pistol which was fired several times into the air and the ground during the beating and robbery.

Capps was ordered back into the rear of the truck. Initially, the three men planned to leave Capps somewhere without further harm to him. While driving from the farm, they decided that because he could identify them, they would kill him. They drove to a secluded area near the Whitewater River. The victim stepped down from the truck and Mathis shot him in the back of

the head with defendant's gun. The three men tied up the body with a chain and cinder block from the truck and dropped the body in the river.

On January 5, 1987, Mathis walked into the Douglas Police Department, confessed to the crimes, and led the officers to the body. Mathis told of the involvement of Horton and defendant. Defendant was convicted of first-degree murder and of aggravated kidnapping.

The first three issues on appeal involve witness Eileen Burnau, a serologist with the Kansas Bureau of Investigation. The sequence of events involving Ms. Burnau is significant and must be set forth in considerable detail. The jeans defendant had been wearing while the crimes were being committed were seized by the Butler County Sheriff's Department. They were sent, along with a sample of the victim's blood, to the KBI laboratory on January 15, 1987. The purpose was to determine if any of the victim's blood was on the jeans. On March 11, 1987, Ms. Burnau made a report of her findings that the bloodstains on the jeans were not from the victim. The report was mailed to the sheriff's department, the sending agency. The report was received on April 4 or 5. The report was forwarded on to the county attorney. When this was done is uncertain. A deputy sheriff stated it was forwarded a week after its receipt. The county attorney stated he received it on May 7. The report is file-stamped as being received on the latter date. A copy of the report was provided to defense counsel on May 9, 1987.

After receipt of the report, the county attorney telephoned Ms. Burnau, where he was told there was a fifth bloodstain on the jeans which, when "queried," was consistent with the victim's blood but that the "query" was not strong enough to include in her report. The county attorney asked her to do further analysis on the stain. The sequence of events is important as the trial was scheduled to begin on May 12, 1987. On May 12, 1987, Ms. Burnau made a report that the fifth bloodstain was consistent with the victim's blood. On May 13, 1987, the second day of trial, the State moved to endorse Ms. Burnau as an additional witness, the county attorney having received the inculpatory report on the previous day. The motion was sustained over defense counsel's objection.

The first issue is whether the defendant was denied a fair trial

under the due process clause of the Fourteenth Amendment by prosecutorial failure to disclose the existence of exculpatory evidence.

In *State v. Carmichael*, 240 Kan. 149, 152, 727 P.2d 918 (1986), we discussed the prosecutorial duty to disclose exculpatory evidence as follows:

"A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is material to the guilt or innocence of the defendant. Suppression of such evidence is a violation of the defendant's Fourteenth Amendment due process rights. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Prosecutors are under a positive duty, independent of court order, to disclose exculpatory evidence to a defendant. To justify a reversal of a conviction for failure to disclose evidence, the evidence withheld by the prosecution must be clearly exculpatory and the withholding of the evidence must be clearly prejudicial to the defendant."

The district court held there was no wrongdoing on the State's part, and that the State had not been remiss in turning the exculpatory report (dated March 11, 1987) over to defense counsel. Although the district court does not specifically find the report was actually received by the county attorney's office on May 7 rather than earlier, we believe such a finding is inherent in the court's verbal determination of this question. There is certainly sufficient evidence to support such a finding. Additionally, in issues numbers two and three, defense counsel, in essence, states he relied so heavily on the exculpatory report in building his defense that the subsequent inculpatory report shattered the defense to the degree that the defendant did not receive a fair trial. Under such circumstances, it is difficult to see how the failure to receive the exculpatory report earlier was clearly prejudicial to the defendant. We conclude this issue is without merit.

For his second issue, defendant contends the district court erred in permitting the late endorsement of witness Eileen Burnau.

In *State v. Bryant*, 227 Kan. 385, 387, 607 P.2d 66 (1980), we discussed the late endorsement of witnesses as follows:

"K.S.A. 1978 [now 1987] Supp. 22-3201(6) has been construed to confer broad discretionary power on the trial court in allowing a late endorsement. A trial court's order permitting a late endorsement of a witness is not to be overturned absent an abuse of discretion. The test is whether the defendant's rights have been prejudiced. *State v. White & Stewart*, 225 Kan. 87, 91, 587 P.2d 1259 (1978). This court will not condone surprise caused by the intentional withholding of the

name of a witness as a part of the prosecution's trial strategy. *State v. Stafford,* 213 Kan. 152, 164, 515 P.2d 769 (1973), *modified* 213 Kan. 585, 518 P.2d 136 (1974). The purpose of the endorsement requirement is to prevent surprise to the defendant and to give him an opportunity to interview and examine the witnesses for the prosecution in advance of trial. *State v. Stafford,* 213 Kan. at 164. The trial court commits reversible error in allowing a late endorsement when surprise prevents 'a fair preparation of his defense.' *State v. Wilson & Wentworth,* 221 Kan. 359, 559 P.2d 374 (1977). Accordingly, this court has traditionally required the defendant not only to object to the late endorsement but to request and be denied a continuance before a late endorsement will constitute reversible error. See for example, *State v. Wilson & Wentworth,* 221 Kan. at 365."

In the case before us, the second report, inculpatory in nature, was not received by the State until the trial was in progress. The prosecution promptly made its existence known to defense counsel. This new evidence was a surprise to both counsel. The district court granted defense counsel the opportunity to interview Ms. Burnau prior to her testimony. Further, counsel did not request a continuance. Under the standards set forth in *State v. Bryant,* 227 Kan. 385, we conclude that no reversible error occurred in the district court's allowance of the late endorsement of the witness. However, the residual and cumulative effect of the late endorsement must be considered in determining the next issue.

For his next issue, defendant alleges prosecutorial misconduct in the closing argument. In his opening statement, defense counsel outlined his defense. This may be summarized as follows: the statements given by the State's two eyewitnesses, Billy Mathis and Billy Horton, to the police were not nearly so inculpatory of defendant as the prosecution's opening statement indicated their testimony would be. Both witnesses had entered into plea bargains with the State and their change of testimony as to defendant's participation was a result of the plea bargains. Defendant was present during the crimes committed by Mathis and Horton against the victim, but he was wholly passive during the events. Further, defendant would testify as to what had occurred.

Defendant did not testify. At the close of the evidence, defense counsel requested and received an order from the court directing the State not to comment in closing argument on defendant's failure to testify.

In closing argument the prosecutor stated:

"Do you recall in opening statement—And opening statement is simply what we

lawyers tell you we think the evidence is gonna show. I want you to think hard about what you were told by the defendant you were gonna be shown in this case. Think about what he said he was gonna prove to you, and think about how he said he was gonna prove it, and ask yourselves if he proved any of it. Now, he told you that it wasn't his burden to prove anything, and he's right. The burden's on me to prove everything beyond a reasonable doubt. But, I want you to think about what the defendant said he was gonna show, and ask yourselves if he showed it, and I think you'll conclude that he did not."

The above statements were made during the first section of the State's closing argument. Defense counsel objected to the statements as being a comment on the defendant's failure to testify, in violation of the court's order. The prosecutor argued his comments did not refer to defendant's failure to testify, but just generally to defendant's failure to show through the evidence what he had stated he would show in his opening statement. The trial court overruled the objection, stating, however, that it was a "very close" question. The trial court directed the prosecution to make no further references to the defendant's opening statement in its final closing argument.

A prosecutor in a criminal case may not comment upon an accused's failure to testify. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965); *State v. Reeves*, 224 Kan. 90, 93, 577 P.2d 1175 (1978). Kansas has codified the *Griffin* rule in K.S.A. 60-439. Any such comment is error but is not per se reversible error. In determining that a federal constitutional error constitutes harmless error, a court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt. *State v. Bell*, 239 Kan. 229, Syl. ¶ 3, 718 P.2d 628 (1986).

The comments of the prosecutor can easily be construed herein to be a comment on the defendant's failure to testify, regardless of what the prosecutor intended. Hence, such comments must be held to be improper. Under the totality of the circumstances herein, we cannot declare that the error was harmless under the *Bell* test. The whole situation is made more egregious when one considers how it developed. The prosecution delivered the wholly exculpatory report of Ms. Burnau to defense counsel: The blood on defendant's jeans did not come from the victim. The prosecution did not advise defense counsel that additional testing was going to be done. Defense counsel

relied on the exculpatory report to support his strategy that there was no physical evidence that defendant actively participated in the crimes—only the anticipated testimony of two admitted participants in the crimes. The defense would be that defendant's participation in the events was passive. It was intended that defendant would testify that he remained in the truck when the victim was killed and was, in effect, a bystander to the crimes. Based upon this strategy, defense counsel told the jury in his opening statement that defendant would testify as to his passive involvement. On the second day of trial, defense counsel was told of the second Burnau report, inculpatory of defendant. Faced with this new evidence, defendant elected not to testify and called no witnesses. Then, the prosecutor, in his closing arguments, made comments which could be construed by the jury to highlight defendant's failure to testify. The acts and omissions of the prosecutor placed defendant in a difficult position and the prosecutor impermissibly exploited the situation in his closing argument. We conclude that the prosecutor's comments herein constitute reversible error and defendant's convictions must be reversed.

Defendant's final three issues concern matters which are likely to reoccur in the retrial of this case. For this reason, the same will be discussed.

For his fourth issue, defendant contends the district court erred in instructing the jury it could infer malice, premeditation, and deliberation from the use of a deadly weapon in the killing and the lack of provocation in the killing.

Jury Instruction No. 9 states:

"As to both the crimes of Aiding and Abetting First Degree Murder and Aiding and Abetting Second Degree Murder:

"You are further instructed that if you find beyond a reasonable doubt that a deadly weapon was used in the killing, that fact alone may be sufficient to infer the element of malice as required in either crime.

"As to the crime of Aiding and Abetting First Degree Murder only:

"You are further instructed that if you find beyond a reasonable doubt that a deadly weapon was used in the killing and that there was not provocation for the killing, these facts taken together may constitute sufficient evidence to support an inference of the elements of deliberation and premeditation as required by Aiding and Abetting First Degree Murder.

"You are further instructed that a .22 caliber pistol is a deadly weapon."

Murder in the first degree is defined in K.S.A. 21-3401 as follows:

"Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony."

Murder in the second degree is defined in K.S.A. 21-3402 as follows:

"Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration or attempt to perpetrate a felony."

Hence, malice is an element of both crimes, but deliberation and premeditation are elements only of first-degree murder (excluding felony murder). All three of these elements deal with the thought processes of the perpetrator which renders them difficult to prove by direct evidence in the majority of cases. For example, if the jury hears only that: (1) on Monday morning A had a violent argument with B and threatened to kill B; (2) Tuesday A bought a gun; and (3) Wednesday A hides near B's driveway and shoots B with the purchased gun, the evidence is sufficient for the jury to infer malice, deliberation, and premeditation on the part of A. Other evidence such as that introduced in an insanity defense or of a sudden quarrel on the driveway with the gun being there by inadvertence, etc., might cause the jury to conclude otherwise.

For purposes of our discussion, we must divide the complained-of instruction into two parts. We will first consider the portion relating to inferring deliberation and premeditation. We have found no Kansas cases where such an instruction was given. Our discussion of what a jury could have inferred from the evidence arises from sufficiency of the evidence questions. Illustrative thereof is *State v. Hamilton*, 216 Kan. 559, 534 P.2d 226 (1975), wherein we stated:

"The defendant's final point goes to the sufficiency of the evidence to establish the elements of malice and premeditation, both essential components of first-degree murder as defined in K.S.A. 21-3401. (Weeks 1974) It is argued on behalf of defendant that he and the deceased were complete strangers, rebutting any inference of malice or premeditation.

"This court has long held to the rule that malice in law may be inferred from the fact that a deadly weapon was used in a homicide. (*State v. Earnest*, 56 Kan. 31, 38, 42 Pac. 359; *State v. Dull*, 67 Kan. 793, 799, 74 Pac. 235; *State v. Smith*, 78 Kan. 179, 183, 96 Pac. 39; *State v. Donahue*, 197 Kan. 317, 319, 416 P.2d 287; *State v. Blake*, supra, 202.) These cases accord with the view generally accepted in this country. (40 C.J.S., Homicide, § 78, p. 942.)

"Whether premeditation may also be inferred from use of a deadly weapon is

not so clear. As a general principle it would seem that use of a deadly weapon, standing alone, is not sufficient to establish premeditation. (1 Wharton's Criminal Evidence, 13th Edition, § 135.) In an annotation contained in 96 A.L.R. 2d, Homicide—Premeditation, § 3, p. 1439, we find this statement of the rule:

" 'It appears to be generally agreed that the fact that the killing was effected by the use of a deadly weapon is not, of itself, a sufficient basis for a legal presumption that it was deliberate or premeditated. . . .'

"While the use of a deadly weapon is not alone sufficient to infer premeditation it is one of the circumstances which may be considered in determining whether a homicide was committed with deliberation. We find this discussion set out in 1 Wharton's Criminal Evidence, supra, pp. 226, 227:

" 'According to some courts, if, in addition to the use of a deadly weapon, another circumstance is shown, such as the lack of provocation, the evidence may be of such probative force as to give rise to a presumption, as opposed to a mere inference that the homicide was premeditated and deliberate, thereby casting upon the defendant the burden of going forward with appropriate evidence to explain away such presumption. According to other courts, the existence of premeditation and deliberation which will raise the homicide to murder in the first degree may not be the subject of a legal presumption, but is a matter of inference which the trier of fact may or may not see fit to draw.

" 'Premeditation and deliberation can be found from various circumstances, such as the nature of the weapon used, the lack of provocation, the defendant's conduct before and after the killing, . . .'

"We believe the circumstances surrounding the homicide in this case, which included the use of a deadly weapon, were sufficient for the jury to infer premeditation as well as malice. The victim was unarmed and the attack upon him was unprovoked. After the shooting Mr. Hamilton disposed of his gun. From defendant's actions in following the victim's car, honking his horn and blinking his lights, it is not too much to assume he was angry and intended to pick a quarrel, by telling a cock and bull story and demanding to ride in the victim's car. In a very early case, *State v. Kearley*, 26 Kan. 77, we said:

" '. . . If one party seeks an interview with another, arming himself for the encounter, intending deliberately that such other shall do some certain thing, or failing to do that, that he will kill him, such conditional intent is sufficient, if carried into effect by the homicide of the latter, to make murder in the first degree.' (p. 85.)

"In *State v. Greenwood*, 197 Kan. 676, 421 P.2d 24, where the defendant shot his girl friend with whom he had quarreled, we said that 'the record discloses an abundance of evidence for the jury to draw an inference of premeditation and malice aforethought, as well as an intent to kill the deceased.' (p. 686.) The same may be said in the instant case in view of all the circumstances." 216 Kan. at 566-67.

In *State v. McKibben*, 239 Kan. 574, 722 P.2d 518 (1986), we stated:

"Finally, the defendant argues the circumstantial evidence is insufficient to support his conviction. The defendant argues that to conclude the defendant is

guilty beyond a reasonable doubt requires the stacking of inference upon inference.

"The scope of review applicable when the sufficiency of the evidence is challenged on appeal has been often stated: the question is whether the evidence, when viewed in a light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Zuniga,* 237 Kan. 788, 794, 703 P.2d 805 (1985). When considering the sufficiency of circumstantial evidence to sustain a conviction on appeal, the appellate court's function is limited to ascertaining whether there is a basis in the evidence for the jury's verdict. If the essential elements of the charge are supported by any competent evidence, the conviction must stand. *State v. Soverns,* 215 Kan. 775, 529 P.2d 181 (1974). A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Hanks,* 236 Kan. 524, Syl. ¶ 3, 694 P.2d 407 (1985).

"We find the circumstantial evidence introduced at trial is sufficient to support the defendant's conviction of second-degree murder. The victim was shot in the back and left to die in a field in the country. The defendant had spent the previous evening with the victim. The defendant had given one of his friends a rifle to pawn the next morning. The right rear pocket of defendant's jeans had blood smears which matched the blood of the victim. Only ten percent of the population have blood similar to the victim's, containing the two genetic markers. A package of Benson & Hedges cigarettes recovered from the defendant at the time of his arrest and another package recovered near the victim's body had the same tax stamp number-43667. The supplier who was assigned that tax stamp number distributed Benson & Hedges cigarettes to Quik Trip stores in Salina. Melody Hoeffner testified the defendant stopped at a Quik Trip store after he had taken Sheleen home in the early morning hours of November 3, 1984, and bought two packages of Benson & Hedges cigarettes. At the time of his arrest, the defendant was wearing new shoes, purchased approximately one hour earlier. His old shoes were recovered from a ditch, and an analysis showed the possible presence of blood. The victim had been involved in a forceful act of sexual intercourse within twelve hours of her death. Seminal fluid was found on the inside of the fly of defendant's jeans. The victim had been on her menstrual period when she died. The defendant was found to have blood on his penis.

*"The probative value of each bit of circumstantial evidence permitting its individual inference was for the jury to determine, and the accumulation of these inferences supports the jury's finding of guilt beyond a reasonable doubt. There was no stacking of inference upon inference to establish guilt.*

"The defendant asserts the inconsistencies in Mr. Trow's testimony cause the evidence to be insufficient to establish the defendant was with the victim at 1:40 a.m. on November 3, 1984. The credibility of witnesses is within the province of the trier of fact, and not the appellate court. It is not the duty of this court to weigh the evidence. *State v. Holt,* 221 Kan. 696, 700-01, 561 P.2d 435 (1977).

"The evidence, while circumstantial, could lead a rational factfinder to find the defendant guilty beyond a reasonable doubt." 239 Kan. at 585-86. (Emphasis supplied.)

We must conclude it was error to instruct that premeditation and deliberation could be inferred from the fact of the use of a deadly weapon. That fact, standing alone, does not support such an inference. A gun could be used to kill in first-degree murder, second-degree murder, voluntary manslaughter, or involuntary manslaughter.

We turn then to the portion of the instruction relative to the inference of malice.

In *State v. King*, 221 Kan. 69, 557 P.2d 1262 (1976), we stated:

"Second, the trial court instructed the jury that malice could be inferred from the use of a gun. Appellant objected to the instruction, preferring one which did not mention the permissible inference. The one given, she says, was inconsistent with her theory of self-defense. We find no error in the instruction. Unlike *State v. Earnest*, 56 Kan. 31, 42 Pac. 359, relied on by the appellant, the instruction did not tell the jury to *presume* malice. The jury was elsewhere properly instructed on the state's burden of proof, the defendant's presumed innocence and her theory of self-defense. The jury was thus required to consider the self-defense theory along with all the other evidence and was told only that it was *entitled* to infer malice from the use of a gun. Such has long been our law. *State v. Hamilton*, 216 Kan. 559, 534 P.2d 226, Syl. 5; *State v. Blake*, 209 Kan. 196, 495 P.2d 905, Syl. 4; *State v. Earnest*, supra, Syl. 1." 221 Kan. at 74.

Defendant contends that certain United States Supreme Court decisions have invalidated the quoted portion of *State v. King*. He relies, in part, on *Francis v. Franklin*, 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965 (1985), and *Sandstrom v. Montana*, 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). These cases involve the propriety of a general criminal intent instruction on a person intending all of the usual consequences of his voluntary acts.

PIK Crim. 2d 54.01, given herein, states:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

This instruction has been held to satisfy the requirements of *Sandstrom*. See *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), and *State v. Robinson, Lloyd & Clark*, 229 Kan. 301, 624 P.2d 964 (1981).

Defendant also relies on *Yates v. Aiken*, 484 U.S. 211, 98 L. Ed. 2d 546, 108 S. Ct. 534 (1988). The *Yates* case applied the holding of *Francis v. Franklin*, 471 U.S. 307, to reverse the

murder conviction of a defendant who, with an accomplice, robbed a convenience store. After defendant left the store, a fight occurred in which the accomplice and the storekeeper's mother were both killed. At trial, defendant testified he had left the store before the victim was killed and he had not intended to kill or harm anyone. The jury, however, was instructed "that malice is implied or presumed from the use of a deadly weapon." 98 L. Ed. 2d at 551. After defendant's conviction and death sentence were affirmed by the South Carolina Supreme Court, that court ruled in another case it was error to give such a malice instruction. Defendant sought habeas corpus relief. While his petition was pending, the Supreme Court decided *Francis v. Franklin*, 471 U.S. 307. The South Carolina Supreme Court denied defendant's petition without opinion, but the United States Supreme Court vacated the judgment and remanded for reconsideration in light of the *Franklin* decision. On remand, the South Carolina Supreme Court again denied the petition. Without addressing the *Franklin* decision, it stated its denial was on the ground that its own decision invalidating the malice instruction was not retroactively applicable.

On *certiorari*, the United States Supreme Court reversed and remanded. A unanimous court held that the *Franklin* case was applicable because that decision did not announce a new constitutional rule, but merely applied the principles previously announced in *Sandstrom v. Montana*, 442 U.S. 510. *Yates v. Aiken*, 98 L. Ed. 2d at 553-54.

In support of his position, defendant also cites *United States v. United States Gypsum Co.*, 438 U.S. 422, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978). In *Gypsum*, several gypsum board manufacturers were indicted for violations of the Sherman Act by allegedly engaging in a price-fixing conspiracy. One type of price-fixing action allegedly taken was interseller price verification, which is the practice of telephoning a competing manufacturer to determine the price being currently offered on gypsum board to a specific customer. On this verification issue, the trial judge charged the jury that if the price-information exchanges were found to have been undertaken in good faith to comply with the Robinson-Patman Act, verification alone would not suffice to establish an illegal price-fixing agreement, but that if the jury found that the effect of verification was to fix prices, then the

parties would be presumed, as a matter of law, to have intended that result. 438 U.S. at 429-30. On appeal, the Supreme Court rejected this instruction, stating:

"[W]e hold that a defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices." 438 U.S. at 435.

We believe both the *Yates* and *Gypsum* cases may be distinguished. The instruction herein does not require or direct that malice be found from the use of a deadly weapon. For convenience, the malice portion of the instruction herein is repeated as follows:

"You are further instructed that if you find beyond a reasonable doubt that a deadly weapon was used in the killing, that fact alone may be sufficient to infer the element of malice as required in either crime."

The instruction is not well drawn. Something patterned along the lines of PIK Crim. 2d 54.01, previously cited, would have been preferable. In recent years, we have observed a growing trend toward the simplification of instructions in criminal cases and the elimination of many instructions which emphasize particular portions of the evidence. Although we do not consider the instruction on malice to constitute reversible error herein, we discourage the giving of this type of instruction. The use of a deadly weapon is one of the evidentiary facts from which the jury could infer malice, but we conclude it is the better practice not to give a separate instruction thereon.

For his fifth issue, defendant contends the voluntary intoxication instruction, PIK Crim. 2d 54.12, is clearly erroneous.

The instruction provides:

"Voluntary intoxication is not a defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, intoxication may be taken into consideration in determining whether the accused was capable of forming the necessary intent or state of mind."

This instruction is grounded in and consistent with K.S.A. 21-3208, which provides:

"(1) The fact that a person charged with a crime was in an intoxicated condition at the time the alleged crime was committed is a defense only if such condition was involuntarily produced and rendered such person substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law.

"(2) An act committed while in a state of voluntary intoxication is not less

criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

We conclude this issue is without merit as the instruction given adequately states the applicable law.

For his final issue, defendant contends the trial court erred in permitting the jury to view a videotape taken of the victim's body after it was removed from the river. He contends the tape was inflammatory and irrelevant.

In *State v. Ruebke*, 240 Kan. 493, Syl. ¶¶ 4-5, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987), we stated the general rules concerning the admissibility of photographs, and the appellate standard of review, as follows:

"Photographs are erroneously admitted where they are unduly repetitious, gruesome, and without probative value. *State v. Dargatz*, 228 Kan. 322, 614 P.2d 430 (1980). They are not inadmissible as evidence merely because they may be gruesome and shocking, provided they are true reproductions of relevant physical facts and conditions material to matters in issue. *State v. McCorgary*, 224 Kan. 677, 681, 585 P.2d 1024 (1978)." Syl. ¶ 4.

"The admission in evidence of photographs of homicide victims must necessarily rest largely in the discretion of the trial judge. In each case, it is the trial judge who determines whether the photographs serve a proper purpose in the jury's enlightenment. His action will not be disturbed by an appellate court unless there is an abuse of discretion." Syl. ¶ 5.

The tape showed the condition of the body and how it had been bound and weighted. The videotape is not particularly gruesome and does not involve autopsy procedures. We find no abuse of discretion in the admission of the videotape.

The judgment is reversed, and the case is remanded for further proceedings.