No. 77,620

STATE OF KANSAS, *Appellee,* v. CHESTER L. HIGGENBOTHAM,
a/k/a MATTHEW S. MURPHY, *Appellant.*
(957 P.2d 416)

Opinion filed
April 17, 1998.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Mary A. McDonald,* county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This case concerns the prosecutor's comments during closing argument, district court rulings during trial, and imposition of the hard 40 sentence.

Defendant Chester L. Higgenbotham, alias Matthew S. Murphy, appeals his convictions and sentence following a jury trial for premeditated first-degree murder, K.S.A. 21-3401, and kidnapping, K.S.A. 21-3420. Higgenbotham received a hard 40 sentence for the murder conviction and 49 months, consecutive to the hard 40, on the kidnapping charge. Our jurisdiction is under K.S.A. 22-3601(b)(1), (premeditated first-degree murder is an off-grid crime).

Higgenbotham claims the district court erred in: (1) denying his motion for a mistrial; (2) denying his request that the jury be admonished because the prosecutor referred to him during closing argument as a "man with many secrets"; (3) admitting evidence concerning an Arizona driver's license issued in the name of an alias, when Higgenbotham had offered to stipulate to his true identity; (4) giving, over objection, a limiting instruction on evidence of prior crimes; (5) finding the evidence sufficient to support Higgenbotham's kidnapping conviction; (6) admitting drawings of nude women, seized from his cell; and (7) finding that the killing was committed to avoid or prevent lawful arrest and prosecution and in an especially cruel, heinous, or atrocious manner.

We find no reversible error and affirm.

Higgenbotham assumed the alias of Matthew S. Murphy; thus, we also refer to Higgenbotham as either Murphy or defendant in the opinion.

## FACTS

Jonetta McKown (Jodi) was working as a prostitute on South Broadway in Wichita. Jodi was last seen alive during the early morning hours of September 16, 1995. Her decomposed body was discovered in Harvey County on October 11, 1995. Higgenbotham admitted he had picked up a woman named Jodi in Wichita on September 16, 1995. He said he gave her $50 for companionship and dropped her off at the bus station at approximately 3 a.m.

According to Kevin Permenter, Jodi's boyfriend, Jodi said that a man identified by her friend Mary Simpson as Higgenbotham was in a car parked in front of Mary's apartment. He was looking for cocaine. Permenter and Jodi left to talk to the man, whom Permenter identified as Higgenbotham. Higgenbotham asked Permenter if he knew where to get rock cocaine. Permenter and Jodi got into the car. While in the car, Higgenbotham said that he was from Arizona. Higgenbotham offered Jodi $50 to spend 10 or 15 minutes with him. She accepted the offer. Permenter walked back to his motel room.

Permenter testified that Jodi and Higgenbotham returned to the motel about 10 or 15 minutes later. Jodi said that Higgenbotham had offered her $200 to spend more time with him and to locate cocaine. During the discussion, Brandi Schulz arrived at the motel. Brandi testified that Jodi said that Higgenbotham had offered her $200 to spend the night with him. Permenter told Jodi not to go, but Jodi said she felt comfortable and that they needed the money. Brandi, conversely, testified that Higgenbotham gave Jodi the "creeps" but Permenter told Jodi that they needed the money. Jodi agreed to go. She received $100, which she left in the motel room. Brandi was concerned because of the unusual circumstances (to spend all night and the amount of money). She wrote down the license tag number of Higgenbotham's car. Brandi identified Higgenbotham as the man with whom Jodi left the motel.

When Jodi had not returned on September 17, Brandi filed a missing person report. Wichita police officers learned that the car Brandi had noted was registered to Matthew Murphy, of Newton.

Wichita police officer Paul O'Mara received a phone call from a person who identified himself as Matthew Murphy. Murphy acknowledged that he had been on South Broadway with a woman named Jodi. He said he had offered her money for companionship and had dropped her off at the bus station at 3 a.m.

Vicki Brault testified that she married the defendant, known as Matthew Murphy, in November 1994. (She did not know her husband was Higgenbotham until she was questioned by police in September 1995. She filed for an annulment of her marriage on the grounds of forgery and misrepresentation.) Vicki said that when

she arrived home on the evening of September 15, she found a note from her husband saying that he had gone to a friend's house. She was worried because her husband was not home at 3 a.m. She began looking for him and located their maroon Chrysler in front of a storage locker. The locker was rented by her husband's friend, Chuck Peters, who allowed Murphy to use the locker to work on cars. Vicki said that when she pulled behind the Chrysler, she saw a white female slouched down in the seat of the car. Murphy told her that the woman's name was Jodi or Joanie and that she was a friend of a friend who needed a ride home. While Vicki testified that the woman was not moving, she acknowledged she told police that the woman did not appear to be hurt. Vicki said she told her husband she wanted him home right away. He showed up at the house 3 or 4 minutes later.

The police executed a search warrant for Murphy's residence and for the Chrysler. Both Murphy and his wife agreed to go with the Newton Police to discuss the incident. Detective Snyder testified that in his initial interview, Murphy said he had gone to Wichita about 12:30 a.m. on September 16 to go to the home of an acquaintance. The acquaintance had parts to a vehicle on which Murphy was working. A woman waved at him and asked for a ride. He asked her if she wanted to party and she said yes. They drove to a motel on Broadway and then went to a house. The woman got out of the car and returned with a man who asked him to take them to another house. The man went up to that house, came back and said that he could not get any cocaine and asked to be returned to the motel. After he dropped the man off at the motel, he and the woman continued to drive around. The woman told him that he owed her $50 for companionship. He objected because they had not had sex, but agreed to pay her because he did not want any trouble. He dropped the woman off at the bus station and returned to Newton, arriving home at 4 or 4:30 a.m.

After two interviews with Murphy, Detective Snyder spoke with Vicki Brault, who informed him of her encounter at the storage unit. Snyder again spoke with Murphy regarding Vicki's statement. Murphy said that he had gone to the storage unit to drop off some oil and a filter. He planned to work on his 1977 Plymouth the

following day. While he was there, a woman named J.D. or Joleen, whom he knew from Kay's Lounge, showed up and wanted a ride home. That woman was in his car when Vicki arrived looking for him. The owner of Kay's Lounge testified that there was not a female member or patron of the bar named J.D.

A search of the storage unit produced black nylon wire ties, rolls of duct tape, and some yellow rope. Wadded-up duct tape was found in the back of a Chevette that was inside the unit. A button was found on the floor and a used condom was found in a cardboard box. A crime scene investigator testified that the green duct tape found in the back of the Chevette had hair in it. The investigator also collected hairs and fibers from the Chrysler.

Chuck Peters testified that the black plastic ties that were found in his storage shed did not belong to him. He did have yellow nylon rope. He said that he had seen duct tape in Murphy's tool box. According to Murphy, the condom was not his and he had not had sex in the shed. He also said that it was not Jodi, but a woman named J.D., whom his wife had seen him with at the shed.

Because Officer Snyder had information that Murphy had also used the name Chester Higgenbotham, he asked Murphy if he had used any names other than Matthew Murphy. Murphy said that he had used the name Chester L. Higgenbotham. Snyder testified that Murphy told him his real name was Matthew Murphy and that Chester Higgenbotham was an acquaintance of his in Arizona who had died in an accident. He had obtained an identification card in Higgenbotham's name. During an interview Murphy said that he "could not go into that" and could not say whether he was involved in a witness protection program.

According to Detective Walton's testimony, Murphy had told Walton he had switched his name from Higgenbotham to Murphy because his ex-wife had witnessed a gang-related murder in Arizona. He had been given the name Matthew Murphy through a government witness protection program. The ex-wife testified, however, that (1) she knew the defendant as Chester Higgenbotham, (2) he changed his name to Matthew Murphy when they moved to Oklahoma, and (3) she had neither witnessed a murder nor was in a witness protection program.

An Arizona detective testified that Matthew Murphy died in an accident in November 1989. Several months later, a driver's license was issued under Matthew Murphy's name and date of birth, containing a picture of a person resembling Higgenbotham.

A contract for an escort service in Wichita was found during the initial search of Higgenbotham's residence. The contract, dated September 2, 1995, contained the names Mark Murphy and Sean Murphy Matthew. Peters testified that several weeks before September 16, (1) he and Murphy had gone to Wichita to drink; (2) Murphy wanted to find prostitutes; (3) Murphy found an escort service listed in the telephone book and arranged to have two women come to their motel room; (4) Murphy asked to have sex, but the women refused; (5) Murphy, who was extremely intoxicated, became upset, walked out of the room, and sat in his car; and (6) when Murphy returned, Peters took the car keys and they left. (Peters knew Higgenbotham as Murphy.)

A witness testified that between 9 and 10 a.m. on September 16, he had been driving from Newton to Peabody on Walton Road. As he neared a culvert, he saw a white male, whose physique was similar to that of Higgenbotham. The man rushed up from the right-hand side of the road, jumped into a car, and sped off. This sighting occurred at the location where the body was found. However the car did not look to the witness like the cars shown in the photographs of Higgenbotham's three cars.

Jodi's body was face-down in the dirt. A white sweater and bra were on one side, a pair of panties on the other. Jodi's shirt was pulled down to her waist. Her hands and feet were bound together (hog-tied) behind her back with black plastic pull ties. A yellow rope secured the pull ties. A separate piece of yellow rope was around one of her wrists. Green duct tape was wrapped around her nose and mouth. A bandanna that had been used as a gag was found under the duct tape over her mouth.

Dr. Jill Gould, who performed the autopsy, testified that the pink color of Jodi's teeth, after they were cleaned, indicated death by asphyxiation. However, Dr. Gould could not rule out strangulation. Dr. Gould could not determine whether Jodi died before or after her body was placed in the ditch. Due to the decomposition of the

body, Dr. Gould could not tell whether Jodi had been sexually assaulted. She noted that Jodi had a rose tattoo on the back of one hand. Hair and fiber evidence was collected during the autopsy.

During a shakedown at the Harvey County Jail, several of Higgenbotham's drawings of nude women were seized from his cell. One drawing was of a woman who had a rose tattoo on her right ankle.

Known blood samples from both Jodi and Higgenbotham, the condom found in the storage shed, and the duct tape were submitted for forensic examination. The samples did not contain adequate biological matter to conduct a DNA analysis.

A chemist for the FBI lab compared the button found in the shed with a button from Jodi's blouse. The chemist opined that the button in the shed could have come from the blouse.

A police examiner made a fracture comparison of the duct tape from the shed and the tape on Jodi's body. The examiner testified that the torn end of the duct tape around Jodi's head matched the torn end of the roll of duct tape from the shed. Another end of the duct tape from the body matched an end of the duct tape that was found with hairs in it in the Chevette. There were two ends that did not match. Tire prints near where the body was found were not made by any of Higgenbotham's cars.

The FBI lab conducted a hair and fiber analysis. No evidence of hair transfer between Higgenbotham's items and Jodi was found. The FBI examiner said that the red fibers found on Jodi's socks were consistent with the carpet sample from the Chrysler. Similarly, blue Olefin fibers that were found on all of the items of Jodi's clothing, and on the rope on her body, were consistent with fibers from the deck area of the Chevette. The examiner believed that Jodi had been in both of those vehicles. A similar blue fiber was also found in Higgenbotham's Plymouth. A Caucasian body hair and various fibers found in the condom were not suitable for comparison purposes. The examiner also compared the thread from the button in the shed with the thread in a button from Jodi's shirt and found they were consistent. The examiner said that the rope on the body was not the same rope from the storage shed. Finally,

head hairs on the duct tape in the Chevette were not consistent with Jodi's but were consistent with Higgenbotham's.

## DISCUSSION

### A Man With "Secrets"

Having reviewed the factual background, we now turn to Higgenbotham's claim of error in the denial of his mistrial motion. He argues that the prosecutor's closing argument comment about "secrets" referenced his failure to testify, thus violating his Fifth Amendment right to a fair trial. He also complains that the district court erred in failing to admonish the jury on the references to a "man with many secrets" in closing argument.

The declaration of a mistrial is a matter entrusted to the district court's discretion. Higgenbotham has the burden of showing substantial prejudice before we will find abuse of discretion. *State v. Arteaga*, 257 Kan. 874, Syl. ¶ 6, 896 P.2d 1035 (1995); see K.S.A. 22-3423(1). Judicial discretion is abused only when no reasonable person would take the view of the district court. *State v. Rinck*, 256 Kan. 848, 853, 888 P.2d 845 (1995) (no abuse of discretion found in district court's denial of motion for mistrial).

Higgenbotham links his Fifth Amendment contention to *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 85 S. Ct. 1229, *reh. denied* 381 U.S. 957 (1965). *Griffin* held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Section 10 of the Kansas Constitution Bill of Rights also protects this right. The *Griffin* rule is codified in K.S.A. 60-439. We have said that any comment on the defendant's failure to testify is error, but not per se reversible error. To constitute reversible error, the comments must be prejudicial. See *State v. Beebe,* 244 Kan. 48, 53, 766 P.2d 158 (1988).

We said in *State v. Baker*, 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976):

"In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence, but reasonable inferences may be drawn from the evidence and considerable latitude is allowed in discussing it. Counsel may appeal

to the jury with all the power and persuasiveness his learning, skill and experience enable him to use."

Higgenbotham claims that the prosecutor's statement "And nobody will ever know because it's locked up in the secrets of this man" is a direct reference to his failure to testify. We do not agree. The targeted phrase must be considered in context.

Higgenbotham references *State v. Davis*, 255 Kan. 357, 360-63, 874 P.2d 1156 (1994); *State v. Beebe*, 244 Kan. at 52-54; *State v. Henderson*, 226 Kan. 726, 737, 603 P.2d 613 (1979); *State v. Reeves*, 224 Kan. 90, 92-94, 577 P.2d 1175 (1978); and *State v. Jagger*, 11 Kan. App. 2d 350, 351-52, 720 P.2d 673 (1986), as cases in which the prosecutors' comments were considered *Griffin* violations, although no explicit reference was made to a defendant's refusal to testify. The State counters that the five cases are distinguishable. We agree.

In *Davis*, the prosecutor made direct reference to the fact that the defendant could not " 'give [the jury] one bit of evidence' " throughout the course of the entire trial. We found harmless error. 255 Kan. at 361-62.

The prosecutor in *Beebe* said, " 'But, I want you to think about what the defendant said he was gonna show, and ask yourselves if he showed it, and I think you'll conclude that he did not.' " We found error noting additional egregious conduct from the prosecutor. 244 Kan. at 53.

In *Henderson*, the comment was more direct: " 'In other words, the defendant is not forced to testify against himself.' " We reversed, coupling the prosecutor's calling the jury's attention to Henderson's failure to testify with additional prosecutorial comment. 225 Kan. at 735, 738.

In *Reeves*, the comment was: " 'The constitution under the Fifth Amendment guarantees the right to even not incriminate oneself in a criminal proceeding. You can judge for yourself if that thing should or ought to be considered in your deliberations. I am not supposed to comment on that. I can't comment on it.' " 224 Kan. at 93. We reversed.

The comments before the Court of Appeals in *Jagger* included: " 'We had no direct testimony about Mr. Jagger's intention. Mr.

Jagger is the only person who really knows of his own experience what is intention was. Therefore, you are left with having to decide for yourself what his intention was on the basis of his actions and his statements to other people.' " 11 Kan. App. 2d at 351. Jagger's conviction was reversed.

The State reasons that the prosecutor made no comment, either veiled or direct, about Higgenbotham's failure to testify. Instead, the comments were on the evidence, Higgenbotham's use of a false identify, and the many lies that Higgenbotham told both before and after the crimes in question.

We recently considered a similar issue in *State v. Ninci*, 262 Kan. 21, 936 P.2d 1364 (1997). Ninci was convicted of first-degree felony murder, robbery, and aggravated battery. During closing argument, the State reviewed aspects of Ninci's videotaped statement.

Ninci's counsel moved for a mistrial because he thought the prosecutor's comment was an improper reference to Ninci's decision not to testify. The State asserted that the comment was not improper because it referred only to Ninci's videotaped statement to the police. The district court denied the motion.

We analyzed the prosecutor's comment and said:

"When read in context, it becomes obvious that the prosecutor's closing argument mostly consisted of a dissection of Ninci's videotaped statement. When the prosecutor stated that there was no evidence 'out of Mike Ninci's mouth' as to how Ford compelled him to commit the crimes charged, the prosecutor was referring to the fact that Ninci never told the police on the videotape how Ford compelled him to commit the crimes. The State was not referring to the fact that Ninci had never testified on the stand at trial, as prohibited by *Griffin*." 262 Kan. at 48.

We affirmed Ninci's convictions.

Here, the prosecutor referred to Higgenbotham's secrets often, both in the opening and closing statements, without objection until the last reference. The prosecutor then said, "Nobody's going to know what Jodi was thinking or feeling in the last minutes of her death. Nobody knows. And nobody will ever know because it's locked up in the secrets of this man." Defense counsel lodged an objection and requested a mistrial.

The district judge denied the mistrial but told the prosecutor, "You've used the word 'secret' before, but I think the better course of action would be to stay away from it so the jury does not interpret that as being contrary to the instructions." The judge also denied defense counsel's request for a special instruction to disregard the prosecutor's comments on secrets. The judge commented that the jury would be instructed that a defendant's failure to testify is not to be considered and that arguments and statements of counsel are not evidence. The prosecutor made no further reference to secrets.

We have reviewed the prosecutor's opening and closing statements. We conclude that the prosecutor was referring to what the evidence showed about Higgenbotham's secretive conduct, not his failure to testify at trial. The prosecutor's comments were not of "such a character that the jury would have naturally and necessarily understood the statement to be a comment on [Higgenbotham's] failure to testify." *Ninci*, 262 Kan. at 48.

### The Arizona Driver's License

Higgenbotham next contends that the district court erred in allowing testimony concerning his fraudulent Arizona driver's license under the name of Matthew S. Murphy. The license was obtained a few months after Murphy was killed. Higgenbotham argues that because he offered to stipulate to his true identity, the license testimony was unnecessary and prejudicial. He relies on *Old Chief v. United States*, 519 U.S. 172, 136 L. Ed. 2d 574, 117 S. Ct. 644 (1997). In that case, Old Chief offered to stipulate that he had a prior felony conviction for purposes of violating the statute prohibiting possession of a firearm while a felon. The prosecutor refused the offer. The federal district court upheld the refusal. In a 5-4 decision. the Supreme Court reversed, finding an abuse of discretion in allowing the evidence, in view of the offer to stipulate. The prosecution does not need evidentiary depth to tell a continuous story "when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly independently of the concrete events of a later criminal behavior charged against him." 519 U.S. at 190.

The State argues that it had no obligation to accept the offer, citing *State v. Colwell,* 246 Kan. 382, 385, 790 P.2d 430 (1990), and *State v. Wilson,* 215 Kan. 28, 31-32, 523 P.2d 337 (1974). We agree.

Here, the State had the obligation to establish Higgenbotham's true identity. The State is entitled to prove that element in a manner understandable to the jury. The question of Higgenbotham's true identity came up during the police investigation. Higgenbotham's acquaintances in Newton, including his wife, all knew him as Matthew Murphy. His car was registered in the name of Matthew Murphy, and he identified himself as Matthew Murphy when first contacted by the police. When police asked if he had also used the name Higgenbotham, he admitted doing so. However, he claimed his real name was Matthew Murphy. He was unwilling to talk about it. He said Chester Higgenbotham was someone he knew several years earlier who had been killed in a DUI accident. He admitted obtaining identification in Higgenbotham's name. He also told police that he used the name Matthew Murphy because he was in the government witness protection program. He explained his former wife had witnessed a murder in Arizona. This information had to be checked out by the police. The Wichita police learned that Matthew Murphy was an Arizona college student killed in a bicycle accident in 1989.

This case is distinguishable from *Old Chief* in that Higgenbotham's legal status at the time of the crime was not an issue. His obtaining the fraudulent Arizona driver's license was relevant to both the identity issue and his behavior during the criminal investigation. The general rule that a party need not be required to accept a stipulation is applicable.

### The Limiting Instruction

We now turn to Higgenbotham's assertion of error in the district court's giving, over objection, a limiting instruction on evidence of prior crimes.

The challenged instruction stated:

"Evidence has been admitted tending to prove that defendant, Chester L. Higgenbotham, may have committed crimes or other civil wrongs other than the

present crimes charged. This evidence may be considered solely for the purpose of proving the defendant's intent, motive, plan, or identity, to commit the crimes of first degree murder and/or kidnapping."

Higgenbotham argues that the instruction should have been limited to identity only.

We said in *State v. Bly*, 215 Kan. 168, 176, 523 P.2d 397 (1974):

"The limiting instruction should not be in the form of a 'shotgun' which broadly covers all of the eight exceptions set forth in 60-455. An instruction concerning the purpose of evidence of other offenses should only include those elements of K.S.A. 60-455, which appear to be applicable under the facts and circumstances. Those elements which are obviously inapplicable should not be instructed upon. [Citations omitted.]"

Higgenbotham observes that two types of prior crimes evidence were introduced at trial: his fraudulent application for an Arizona driver's license and his solicitation of sex for money (in violation of K.S.A. 21-3515[1][b]). This evidence, he contends, was irrelevant to intent, plan, or motive.

The Arizona driver's license evidence arguably does not fall within 60-455. In addition to being relevant to establishing Higgenbotham's true identity, the evidence was relevant to verifying or refuting information he gave to police during the criminal investigation. It was not introduced to prove he was disposed to committing murder or kidnapping. Even to the extent that 60-455 does apply, the fraudulent license evidence was relevant to Higgenbotham's true identity.

Higgenbotham's solicitation of sex for money 2 weeks before Jodi's murder, his intoxicated condition, and his angry reaction when the women declined sex are relevant to intent, plan, motive, and identity. He sought to have sex with women for money through an escort service. That effort was unsuccessful. A few weeks later, he returned to Wichita and sought out a prostitute. He picked up Jodi, offering her $200 for the evening. She was murdered. Murphy's (Higgenbotham's) wife described him as having had an argument with her. She could smell alcohol on his breath when she confronted him in front of the storage space around 4 a.m. on September 16, 1995.

Higgenbotham was in Wichita on a weekend evening to drink and move on to the South Broadway area for a sexual encounter. He was unsuccessful in obtaining a prostitute the first time. He succeeded the second time, at least to the point of getting someone to leave with him in his car. His actions showed a common plan.

Higgenbotham's angry reaction after his first solicitation provides the necessary additional causal link to his second try. Also, the failure on the first occasion provides a reason to return for another try. There are simply too many connections between these solicitations: weekend nights 2 weeks apart; same area; intoxication; after failing with the escort service, the next solicitation involves a prostitute picked up on the street; increasing the amount of money offered between the two solicitations; anger resulting from the first (when no one went with him) and murder resulting from the second (when Jodi did go with him). Higgenbotham had a friend along (Peters) during the first solicitation. He went alone the second time. We find no error in the instruction.

## The Kidnapping Conviction

We next consider Higgenbotham's contention that the evidence was insufficient to support his kidnapping conviction.

Our standard of review asks whether, after considering all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could find Higgenbotham guilty beyond a reasonable doubt. *State v. Orr*, 262 Kan. 312, Syl. ¶ 10, 940 P.2d 42 (1997).

We look only to the evidence in favor of the verdict to determine if the essential elements of the charge are sustained. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 1, 755 P.2d 551 (1988).

The kidnapping statute, K.S.A. 21-3420, provides in part:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

"(a) For ransom, or as a shield or hostage;

"(b) to facilitate flight or the commission of any crime;

"(c) to inflict bodily injury or to terrorize the victim or another; or

"(d) to interfere with the performance of any governmental or political function."

Higgenbotham was charged under 21-3420(c).

We said in *State v. Buggs*, 219 Kan. 203, Syl. ¶ 7, 547 P.2d 720 (1976):

"Our kidnapping statute, K.S.A. 21-3420, requires no particular distance of removal, nor any particular time or place of confinement. Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping."

Higgenbotham contends that because Jodi accompanied him voluntarily, he did not take or confine her. Also, he argues that the evidence was insufficient regarding the other alternate elements of the offense. Because Jodi accepted Higgenbotham's offer of $200 for the night, Higgenbotham compares his case to *State v. Patterson*, 243 Kan. 262.

Patterson was convicted of first-degree murder, aggravated kidnapping, and aggravated robbery. We reversed the aggravated kidnapping conviction, ruling that the evidence was insufficient. Patterson was also charged under 21-3420(c). He and a male friend had picked up the female victim at a bar. They drove around in the victim's car and parked. Patterson and the victim engaged in consensual sexual activity in the car. At some point, Patterson became enraged and beat the victim unconscious. When she regained consciousness, he beat her again. Patterson told his friend to obtain a knife. The friend leaned over the back seat, Patterson pushed the victim against the car door, and she was stabbed by the friend while Patterson held her. Her body was dumped in a remote area. We reversed the aggravated kidnapping conviction. The State failed to prove confinement, an essential element of aggravated kidnapping. 243 Kan. at 265.

Higgenbotham also relies on *State v. Cabral*, 228 Kan. 741, 619 P.2d 1163 (1980) (confinement in automobile was of a kind inherent in the nature of forcible rape and incidental to the commission of the crime of rape and was not sufficient to establish the independent crime of kidnapping), and *State v. Holt*, 223 Kan. 34, 574 P.2d 152 (1977) (intention to commit robbery during a previously contemplated trip, which was not communicated to the victim, was not, standing alone, sufficient to show that the taking was accom-

plished by making a false statement or representation pertaining to a present or past existing fact, as required to prove kidnapping by deception).

Higgenbotham argues that there was no evidence that he took Jodi by "force, threat or deception." He observes that because she was willing to accompany him for the night, there was also no evidence that she was unwilling to leave Wichita and travel to Newton with him.

Viewing the evidence most favorably to the prosecution, we conclude that although Jodi voluntarily entered Higgenbotham's car, there was no evidence that she agreed to go to Newton with him. There is evidence of deception (Higgenbotham offered her $200 to spend the night with him), and there is overwhelming evidence of force—apart from the murder itself. Jodi was not in Higgenbotham's maroon Chrysler the whole time. The State presented evidence that Jodi had been inside the storage facility. One of the buttons missing from her blouse was later found on the floor of the facility. The plastic ties, duct tape, and rope used to gag and bind her were linked to the inside of the storage facility. The forensic pathologist testified that at the time Jodi's hands and feet were bound and hog-tied behind her back, she could have been alive. Also, the pathologist surmised that it would be unnecessary to gag and bind a corpse. For that matter, why would it be necessary to bind or gag someone who was unconscious? The evidence also showed that, based on carpet fibers found on her body, Jodi had been in the back of the Chevette that was parked inside the storage facility. The pathologist could not rule out the possibility that Jodi was still alive at the time she was left in the country. The bindings did not cause Jodi's death. The gag may not have caused death, assuming she could still breath through her nose. The layers of duct tape wrapped tightly around her mouth and nose most likely caused her death by asphyxiation. The taping could have been at the same time or hours after she was bound and gagged. Higgenbotham may not have made the decision to kill her until sometime after she was bound and gagged. An opened condom was found in a trash can at the storage facility. Jodi's underpants and bra were found next to her body. Her blouse was pulled down

around her waist. The bindings are themselves evidence that Jodi experienced torture and terror while alive.

Higgenbotham contends there was no evidence of any threats. He cites the alternative means rule stated in *State v. Timley*, 255 Kan. 286, Syl. ¶ 1, 875 P.2d 242 (1994) (affirming rape and aggravated criminal sodomy convictions; evidence was sufficient to support commission of the offenses either by means of force or by means of threat):

> "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means."

" 'In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.' " 255 Kan. at 289 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]). See *State v. Kelly*, 262 Kan. 755, 760, 942 P.2d 579 (1997) (quoting and applying the above provisions in an aggravated battery case concerning whether evidence supported finding of great bodily harm, or alternatively, disfigurement). As the State points out, "A person would not voluntarily agree to be bound, gagged, or injured." The evidence is consistent with a finding that the confinement was accomplished by use of threat and force.

## The Jail Drawings

Higgenbotham asserts error in the admission of five pencil drawings of nude women, seized from his cell during a jail shakedown four days before trial. He claims: (1) the drawings had no probative value and (2) they were inflammatory and highly prejudicial.

The State contends the face in one of the drawings resembles Jodi's face. Another drawing has two tattoo patterns, one containing a rose. Jodi had a rose tattoo on the back of her hand.

The admissibility of physical evidence lies with the discretion of the district court. Admissibility is to be determined based on its relevance concerning the accused and the crime charged. The determination of relevancy is a matter of logic and experience, not a

matter of law. *State v. Ji*, 251 Kan. 3, 15, 832 P.2d 1176 (1992). See *State v. Kelly*, 262 Kan. at, 765 (determining that admission of prison-issued razors and blades for demonstrative purposes in aggravated battery case was not abuse of discretion).

Over objection, the district court admitted the drawings "for what they're worth. . . based on the fact that there is some characteristic evidence between the face on the drawing and the picture of Jonetta McKown, and also the fact of the tattoo being similar, albeit the tattoo, I note, I believe, is located in the drawing on a different part of the physical body." One drawing of a vagina would not have any relevance, other than being located with the other drawings at the time of seizure. Its admission is harmless error. Although the other drawings may well have limited relevance, may be prejudicial, and another judge may have excluded them, their admission is not error under an abuse of discretion standard of review.

## The Hard 40 Sentence

The final issue relates to Higgenbotham's contention that the hard 40 sentence was erroneous. The State requested, and the court imposed, the hard 40 for the first-degree murder conviction, based upon the following two K.S.A. 21-4636 aggravating circumstances:

"(e) The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.
"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner."

Defense counsel argued that the K.S.A. 21-4637(c) mitigating circumstance applied: "The victim was a participant in or consented to the defendant's conduct."

We addressed the standard of review for a hard 40 sentence in *State v. Brady*, 261 Kan. 109, Syl. ¶ 4, 929 P.2d 132 (1996):

"When the sufficiency of the evidence is challenged for establishing the existence of an aggravating circumstance in a hard 40 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt."

We have held that the existence of one aggravating circumstance may alone be sufficient to support the hard 40. *State v. Reed*, 256 Kan. 547, 563, 886 P.2d 854 (1994).

The district judge said at sentencing that he was having trouble reading exactly what K.S.A. 21-4636(e) meant. He reasoned that the statute could be interpreted either that Higgenbotham committed the murder to avoid prosecution for the kidnapping, or that he committed the murder in a way to avoid detection and prosecution for the murder. The judge decided that under either interpretation, the aggravating circumstance was present.

Higgenbotham argues that in other cases, K.S.A. 21-4636(e) has been applied when the killing is committed in order to avoid arrest or prosecution for a separate crime, not the murder itself, citing *Reed*, 256 Kan. at 563; *State v. Cromwell*, 253 Kan. 495, 856 P.2d 1299 (1993), *modified* by *State v. Willis*, 254 Kan. 119, 130, 864 P.2d 1198 (1993); *State v. Kingsley*, 252 Kan. 761, 851 P.2d 761 (1993), *modified* by *Willis*, 254 Kan. at 130; and *State v. Bailey*, 251 Kan. 156, 834 P.2d 342 (1992), *modified* by *Willis*, 254 Kan. at 130.

Commission of murder to avoid prosecution for a separate crime other than the murder is the proper interpretation. Here, if there was sufficient evidence to establish that Higgenbotham murdered Jodi to avoid or prevent prosecution for kidnapping, the aggravating circumstance of murder to avoid arrest or prosecution would be present.

The evidence here showed that Higgenbotham first kidnapped Jodi, binding and gagging her. At some point thereafter, he killed her by wrapping 18 layers of duct tape around her nose and mouth. He then concealed her body by taking it to a secluded area. The evidence is sufficient to support the interpretation that murder was committed to avoid prosecution for kidnapping.

We discussed the heinous, atrocious, or cruel aggravating circumstance in two recent cases: *State v. Dias*, 263 Kan. 331, 949 P.2d 1093 (1997), and *State v. Follin*, 263 Kan. 28, 947 P.2d 8 (1997). In *Dias*, defendant went to his estranged wife's home and after she spurned his request for reconciliation, he told her "this is it." He stabbed her three times (with a carving fork from the

kitchen). While she watched, he grabbed a knife, knelt over her, stabbed himself in the abdomen, and then placed his hand over her mouth to stop her breathing. We affirmed the defendant's first-degree murder conviction and the hard 40 sentence. 263 Kan. at 338.

We reached a contrary aggravating circumstance conclusion in *Follin*. Follin took his two young daughters to a lake and stabbed them to death with a knife. There was no evidence of defensive wounds, although one body showed some bruises and scrapes. Follin was convicted of two counts of first-degree murder. He was sentenced to two consecutive hard 40 sentences, based on two aggravating circumstances: purposely killing more than one person and murder in an especially heinous, atrocious, or cruel manner. We affirmed, but decided that there was insufficient evidence to support the heinous, atrocious, or cruel murder circumstance. The single remaining aggravating circumstance still outweighed any mitigating circumstances. 263 Kan. at 53.

Here, Jodi was bound, hog-tied, and gagged. The forensic pathologist testified that the condition of the skin tissue under the bindings was consistent with Jodi's being alive at the time she was bound. Although there was no direct evidence that she was conscious at the time, why would someone bind and gag an unconscious or dead person? The forensic pathologist also testified that the cause of death was asphyxiation due to the duct tape wrapped around the nose and mouth, although death by strangulation could not be ruled out. Death by asphyxiation would take at least 5 minutes. (We note that under *Kingsley*, what happens while the victim is unconscious is still relevant to a heinous, atrocious, and cruel determination. 252 Kan. at 794.)

We find that the two aggravating circumstances did exist. The hard 40 sentence is upheld. The district judge made no finding that the mitigating factor of K.S.A. 21-4637(c) (victim consented to the defendant's conduct) existed. Thus, no mitigating factors are present.

Affirmed.